Present: All the Justices

VIRGINIA HIGHLANDS AIRPORT AUTHORITY

OPINION BY
v.    Record No. 080286    JUSTICE LEROY F. MILLETTE, JR.
January 16, 2009
SINGLETON AUTO PARTS, INC.


FROM THE CIRCUIT COURT OF WASHINGTON COUNTY
Larry B. Kirksey, Judge

This appeal involves the interaction of a local zoning ordinance establishing an airport safety overlay zone and an avigation easement[1] sought by the Virginia Highlands Airport Authority[2] (Airport Authority) to remove obstructions on the property of Singleton Auto Parts, Incorporated (Singleton), which were preserved pursuant to a grandfather clause in the ordinance.  We are presented with the novel issue whether the easement constitutes a taking of airspace requiring compensation when the property was already subject to preexisting restrictions on development imposed by the ordinance.

We hold that the easement constituted a taking only to the extent that it created a right in the Airport Authority to remove the grandfathered obstructions situated on the property which penetrated the existing approach zone for incoming and

_____

[1] An avigation easement is defined as "[a]n easement permitting unimpeded aircraft flights over the servient estate." Black's Law Dictionary 549 (8th ed. 2004).

[2] The Virginia Highlands Airport Commission's name was changed to the Virginia Highlands Airport Authority by action of the Board of Supervisors of Washington County, Virginia.

outgoing aircraft. We therefore will reverse the trial court's judgment entering the jury's verdict and remand for a new trial on damages resulting from the limited taking.

BACKGROUND

In 1998, the Town of Abingdon enacted the Virginia Highlands Airport Safety Overlay Zone (the Ordinance), which was "designed to identify and regulate obstructions within that airspace" with the intent of "prevent[ing] any obstruction that has the potential for endangering the lives and property of the users of the Virginia Highlands Airport [(the Airport)] and the residents of the Town of Abingdon" or "reduc[ing] the size of areas available for landing, takeoff and maneuvering of aircraft, thus tending to destroy or impair the utility of the airport and the public investment therein." The Ordinance was enacted in compliance with former Code § 15.1-491.02, predecessor of Code § 15.2-2294 ("Airport safety zoning").[3]

---

[3] Code § 15.2-2294 reads in its entirety:

Every locality (i) in whose jurisdiction a licensed airport or United States government or military air facility is located or (ii) over whose jurisdiction the approach slopes and other safety zones of a licensed airport, including United States government or military air facility extend shall, by ordinance, provide for the regulation of the height of structures and natural growth for the purpose of protecting the safety of air navigation and the public investment in air navigation facilities. The ordinance may be adopted regardless of whether the local governing

2

"Approach zone" is defined by the Ordinance as "[a] zone that extends away from the end of the primary surface with the floor set by the approach surface for a distance *set by the regulations*" and "approach surface" is defined as "[a] surface, *whose design standards are set by the regulations*, longitudinally centered on a runway centerline, extending outward and upward from the end of the primary surface, and at the same slope as the approach zone height limitation slope." (Emphasis added).  Pursuant to the Ordinance, both the approach surface and approach zone, which together provide an area of clearance for incoming and outgoing aircraft, are set by "regulations," defined therein as "Part 77.25 et seq., Subchapter E (Airspace) of Title 14 of the Code of Federal Regulations and/or its successor federal regulations, as they may be amended or substituted from time to time."

The Ordinance also provides that

> in any zone created by th[e] ordinance . . . no vegetation shall be allowed to grow to a height so as to penetrate any referenced surface . . . of any zone provided for in this article at any point.  The height restrictions, or floors, for the individual zones shall be those planes

---

> body has adopted a zoning ordinance applicable to other land uses in the locality. The ordinance may be designed and adopted by the locality as an overlay zone superimposed on any preexisting base zone.
> The provisions of the airport safety zoning ordinance shall be in compliance with the rules of the Virginia Aviation Board.

delineated as surfaces in Part 77.25 et seq. . . . of Title 14 of the Code of Federal Regulations.

The Ordinance did, however, contain a grandfather clause preserving any nonconforming structure or vegetation within the approach zone so long as the structure or vegetation was in existence when the Ordinance was enacted.

In April 2005, the Airport Authority filed a petition for condemnation of an avigation easement, seeking to condemn rights to airspace over property owned by Singleton. The Airport Authority sought in its petition for the easement

> [t]he continuing perpetual right to clear, and keep clear, with the right to remove any natural growth or man-made structure to the ground . . . infringing upon or extending into that airspace about or above a plane on a slope . . . *extending outward from the runway end at a distance of 10,000 feet* along the extended centerline of the runway . . . and *extending at a slope of one (1) foot rise for every thirty four (34) feet horizontal distance* along the extended centerline.

(Emphasis added).

The Airport Authority wanted to superimpose the dimensions of the easement on the dimensions of the Ordinance and thereby obtain the right to remove any vegetation or structure that had been grandfathered under the Ordinance and penetrated the 34 to 1 approach slope. According to the Airport Authority, the exact airspace dimensions included in the easement had already been restricted upon the enactment of the Ordinance. In its Petition for Condemnation, the Airport Authority sought to remove some

4

trees on Singleton's property that existed on the effective date of the Ordinance, because they penetrated the 34 to 1 approach surface.[4]

Singleton filed a motion in limine to "prohibit the [Airport Authority] from arguing that it does not need to take the easement because it already has the rights under the zoning ordinance."  The Airport Authority filed motions in limine seeking to exclude evidence of damages to Singleton's property that Singleton claimed from its inability to build into the 34 to 1 approach surface above the property as a result of the easement.  The Airport Authority also sought to exclude evidence of damages to Singleton's property caused by increased noise, vibrations, fumes, and traffic because of lower flights over the property due to the easement.

The trial court ruled that the Airport Authority's contention that the easement did not take any airspace rights from Singleton because the Ordinance had already created the 34 to 1 approach zone was a "matter for [determination by] the finder of fact."  The trial court allowed the Airport Authority to present evidence as to the existence of the Ordinance, but no opinion testimony as to its effect upon Singleton's ownership rights.  Singleton was permitted to introduce evidence of

---

[4] The top of the tallest tree on the Singleton property penetrated the 34 to 1 approach slope by approximately 12 feet.

5

damages caused by restrictions on vertical development imposed by the easement regardless of the preexisting Ordinance, as well as evidence of the effect of lower flights and resultant increased noise, vibrations, fumes, and traffic.

The issue for the jury was compensation to Singleton for the easement obtained by the Airport Authority. The Airport Authority called Matthew D. Ripley as its expert real estate appraiser. Ripley recognized that there were preexisting limitations on building on Singleton's property imposed by the Ordinance. Ripley demonstrated his understanding of the Ordinance when he testified that

> [t]he easement provides the ability to remove
> obstructions above the elevation of the existing
> zoning overlay zone. . . . The only obstructions
> that are outside of the zoning ordinance that
> would be [a]ffected by this easement are the pine
> trees . . . at the back of the property.

Ripley placed no value on the existence of the easement or on the trees, because the trees were inconsistent with the property's best use as commercial property. Instead, Ripley valued just the right to go onto the property and remove the trees. Based on this analysis, Ripley concluded:

> [T]he compensation should be nominal because you
> can't – there's not going to be any use that you
> couldn't do after the easement is put in place
> . . . . So, the compensation is based – a nominal
> value on the underlying land and I put one percent
> of the underlying land value which is $1,600 based

6

on the $160,000 of the land value at the beginning.[5]

Singleton called two witnesses to testify about damages: Andrew Hargroves, an expert in real estate evaluations; and David Castle, an expert real estate appraiser. Castle testified that the easement reduced the value of the Singleton property by $50,000, with $25,000 attributed to the rear portion of the property and $25,000 to the front portion of the property.[6] Castle opined that his damages figures represent the rights taken by the easement and that the damage is created by the easement's proximity to the Singleton property.

Hargroves valued Singleton's damages at $100,000. Hargroves testified that the damages were based upon the height limitations on the rear portion of the property and upon the limitation of market interest in the property because of the noise factor associated with the property's location directly under the flight path of the Airport. However, Hargroves acknowledged that he did not understand the Ordinance.

The jury returned a verdict in favor of Singleton for $130,000, comprised of $80,000 for the taking of Singleton's property plus $50,000 for damages to the residue. The Airport

---

[5] Ripley valued Singleton's 1.6 acres of land, exclusive of the auto parts building, at $100,000 per acre.

[6] The front half of the Singleton property is zoned commercial. The rear portion is zoned residential, though it is used for commercial purposes.

Authority filed exceptions to the jury's verdict, asking the trial court to set it aside.  The trial court overruled the Airport Authority's exceptions and entered judgment on the verdict.  This appeal followed.

                              DISCUSSION

The central dispute in this case is whether the easement constituted a taking of airspace rights from Singleton which Singleton retained after the enactment of the Ordinance.  In order to resolve this issue, we must determine the approach zone, approach surface, and corresponding approach slope authorized for the Airport's runway 24 by the Ordinance upon its enactment in 1998.

The Airport Authority argues that pursuant to the Ordinance, runway 24's approach surface extends for a horizontal distance of 10,000 feet at a slope of 34 to 1.  Singleton counters that pursuant to the Ordinance, the approach surface extends for a horizontal distance of 5,000 feet at a slope of 20 to 1, which sits above the 34 to 1 approach slope and therefore at a greater distance above the property.  The ratios 34 to 1 and 20 to 1 designate slopes representing "imaginary surfaces" designed by the Federal Aviation Administration.

The Airport Authority supports its argument by referring to the language of 14 C.F.R. § 77.25(d)(2) (2007) in conjunction with evidence of the type of aircraft that use runway 24.  The

                                    8

Airport Authority asserts that the Ordinance is silent on the approach zone and approach surface, which form the approach slope. Further, the Airport Authority argues that the Ordinance incorporates specific federal regulations. The Airport Authority contends that those regulations must be considered in determining the approach slope set by the Ordinance.

Colonel Ronald V. Deloney, manager of the Airport, testified at trial that runway 24 is a "nonprecision instrument runway[], other than utility." Colonel Deloney also testified that the Airport has a physical weight bearing capacity of 30,000 pounds for single wheel aircraft and, for this reason, large aircraft had been operating at the Airport since about 1989. Large aircraft have also been stationed in the Airport's hangars and flown in and out of the Airport. Colonel Deloney defined large aircraft as weighing more than 12,500 pounds. He explained that the Airport is currently designated as type B-II small, but with a 34 to 1 approach slope free of obstructions, it would be designated as type B-II large. The B-II large designation indicates that aircraft weighing over 12,500 pounds could safely use runway 24. Colonel Deloney acknowledged that the Airport was operating with a 20 to 1 approach slope due to then existing obstructions.

In response, Singleton called Susan Van Fleet, owner of a flight school at the Airport, who testified that the current

approach slope for runway 24 was 20 to 1.  Singleton also relied upon two documents: the Virginia Highlands Airport Layout Plan Update (Layout Plan), which was based on conditions as they existed in August 2002; and an Obstruction Study prepared for Virginia Highlands Airport Commission by Delta Airport Consultants, Incorporated (Obstruction Study), which was dated March 2000.  Specifically, Singleton highlighted in its argument the Layout Plan's language that "Virginia Highlands Airport currently has a non-precision instrument approach for Runway 24, and the approach slope is 20:1, for small aircraft (less than 12,500 pounds)" and the Obstruction Study's statement that "[t]he localizer approach to Runway 24 is currently in use with operations limited to aircraft less than 12,500 lbs, which only requires a 20:1 approach slope."  Based on these excerpts and Van Fleet's testimony, Singleton argues the easement constituted a taking of not only the trees, but of over 100 feet of airspace representing the difference between the existing 20 to 1 approach slope and the lower 34 to 1 approach slope obtained by the Airport Authority through the easement.  Singleton asserts that because the 34 to 1 approach slope would allow aircraft to fly lower over its property, Singleton claims damages from increased noise, vibrations, fumes, and traffic due to the condemnation.

10

In order to ascertain the effect of the 1998 Ordinance on Singleton's property, we must interpret the Ordinance in conjunction with the federal regulations referenced therein to determine whether the Ordinance created a safety overlay zone with an approach slope of 34 to 1 or an approach slope of 20 to 1.  It is well-established that an issue of statutory interpretation such as this is a pure question of law subject to this Court's de novo review.  Budd v. Punyanitya, 273 Va. 583, 591, 643 S.E.2d 180, 184 (2007); Virginia Polytechnic Inst. & State Univ. v. Interactive Return Serv., Inc., 271 Va. 304, 309, 626 S.E.2d 436, 438 (2006); Ainslie v. Inman, 265 Va. 347, 352, 577 S.E.2d 246, 248 (2003).

The Ordinance is silent regarding the creation of an approach slope for runway 24 and instead refers to "Part 77.25 et seq., Subchapter E (Airspace) of Title 14 of the Code of Federal Regulations and/or its successor federal regulations, as they may be amended or substituted from time to time" to establish mandatory approach surfaces at the Airport.  The relevant federal regulation is 14 C.F.R. § 77.25(d)(2), which reads in pertinent part: "The approach surface extends for a horizontal distance of: (i) 5,000 feet at a slope of 20 to 1 for all utility and visual runways; [and] (ii) 10,000 feet at a slope of 34 to 1 for all nonprecision instrument runways other than utility; . . ."

It is uncontested that runway 24 is a nonprecision instrument runway.  Therefore, the key inquiry is whether it is a utility runway.  If it is a utility runway, the federal regulations require only a 20 to 1 approach slope, but, if it is not, they require a 34 to 1 approach slope.  Pursuant to 14 C.F.R. § 77.2 (2007), "*[u]tility runway* means a runway that is constructed for and intended to be used by propeller driven aircraft of 12,500 pounds maximum gross weight and less."  The evidence reveals that aircraft weighing over 12,500 pounds have used runway 24 since approximately 1989 because the runway's weight bearing capacity is 30,000 pounds.  At oral argument on appeal, Singleton attempted to avoid this evidence by arguing that pilots retain discretion regarding the landing of their aircraft.  "[I]f a pilot feels confident, capable in himself and his equipment he can land a larger plane there."  The federal regulations provide no such discretion.  According to the plain language of 14 C.F.R. § 77.25(d)(2), if airplanes weighing over 12,500 pounds are utilizing a nonprecision runway, then a 34 to 1 approach slope is required to ensure sufficient clearance for safety purposes.

The Layout Plan and Obstruction Study relied upon by Singleton in support of its argument actually provide greater support to the Airport Authority's position than to Singleton's position.  The documents state that after the promulgation of

12

the Ordinance the Airport was entitled to use a 34 to 1 approach slope for runway 24, but was prevented from doing so due to obstructions such as the trees on Singleton's property.  Runway 24's publication of a 34 to 1 approach slope was subject to the removal of obstructions through the acquisition of avigation easements, whereas an unobstructed 20 to 1 approach slope could already be published to indicate its safe use.[7]

According to the Layout Plan, which was based on conditions as they existed in August 2002,

> [t]he runway pavement strength is listed as a 12,500 pound single wheel gear configuration . . . . The actual pavement strength of Runway 6-24 is 30,000 pounds single gear.  However, the actual strength cannot be published until obstructions are removed from the Runway 24 end to allow a 34:1 approach slope.[8]

Additionally, the Layout Plan states:

> Virginia Highlands Airport currently has a non-precision instrument approach for Runway 24, and the approach slope is 20:1, for small aircraft (less than 12,500 pounds).  The Airport is presently conducting an obstruction program to acquire avigation easements and to remove penetrations (primarily trees) to the Runway 24 34:1 approach surface.  Once the obstructions are removed, the approach slope for Runway 24 can be

---

[7] The Federal Aviation Administration (FAA) publishes the weight bearing capacity of runways.  The Airport cannot currently be published in the official FAA document as having a pavement strength of anything more than 12,500 pounds because it only has an *unobstructed* 20 to 1 approach surface.

[8] The airport has one physical runway, designated as runway 6 for aircraft proceeding southwest to northeast and as runway 24 for aircraft proceeding northeast to southwest.  Airport Authority's Opening Br. 8.  This appeal concerns only runway 24.

> published to a slope of 34:1, allowing large
> aircraft (greater than 12,500 pounds) to utilize
> the runway.

The recommendation provided in the Layout Plan was to "maintain the non-precision greater than 3/4th mile visibility approach surface," defined as having a 34 to 1 approach slope.

The Obstruction Study, dated March 2000, states that "[f]or the purposes of the [Federal Aviation Regulation] Part 77 obstruction analysis, Virginia Highlands Airport is considered a *public use* airport with one *larger than utility* runway.  The airport . . . utilizes a non-precision instrument approach to Runway 24."  The Obstruction Study contains a recommendation that "clearing of obstructions to Runway 24 Approach and Transitional Surfaces should be addressed as a priority project by the Virginia Highlands Airport Commission, if Runway 24 is to be used for a 34:1 approach" and, "[i]n the interim, the current 20:1 approach should be maintained."

This evidence, combined with testimony by the Airport's manager that runway 24 was currently *operating* with a 20 to 1 approach slope due to the existence of obstructions, leads us to the conclusion that, when the easement was requested, runway 24 was a "nonprecision instrument runway[] other than utility" required by 14 C.F.R. § 77.25(d)(2) to have a 34 to 1 approach slope, but could not be designated as such in publications until the obstructions were removed.  Therefore, the easement imposed

14

the same restrictions on Singleton's vertical development as did the Ordinance.

"Compensatory damages are those allowed as a recompense for loss or injury *actually sustained*." Dillingham v. Hall, 235 Va. 1, 3, 365 S.E.2d 738, 739 (1988) (emphasis added). In condemnation cases, "'[t]he measure of compensation for the property taken is the fair market value of the property at the time of the taking. In determining fair market value, consideration is given to the property's adaptability and suitability for any legitimate purpose in light of conditions and circumstances that exist at the time of the take or that reasonably may be expected in the near future.'" Revocor Corp. v. Commonwealth Transp. Comm'r, 259 Va. 389, 394, 526 S.E.2d 4, 7 (2000) (quoting Lynch v. Commonwealth Transp. Comm'r, 247 Va. 388, 391, 442 S.E.2d 388, 389-90 (1994)). When there is only a partial taking, "the measure of damages to the residue of the property not taken is the difference in the fair market value of the residue immediately before and immediately after the taking." Commonwealth Transp. Comm'r v. Glass, 270 Va. 138, 154, 613 S.E.2d 411, 420 (2005) (quoting City of Virginia Beach v. Oakes, 263 Va. 510, 516, 561 S.E.2d 726, 728-29 (2002)). By ignoring the existence of the Ordinance, Singleton's evidence of damages created a false inference of a decrease in fair market value as a result of the taking. Singleton had no fewer rights

15

to the airspace above the 34 to 1 approach surface when the Airport Authority obtained the easement than it did after the Ordinance was enacted in 1998.

Moreover, "a landowner whose property is affected by a partial taking may not recover damages to the residue if such damages are remote or speculative." Oakes, 263 Va. at 516, 561 S.E.2d at 729; Revocor Corp., 259 Va. at 394, 526 S.E.2d at 7-8; Lynch, 247 Va. at 391, 442 S.E.2d at 389-90. Singleton presented only the possibility of future lower flights over its property and resultant increased noise, vibrations, fumes, and traffic to the jury, without any evidence from which the jury could quantify damages. The inclusion of such remote and speculative possibilities in the evidence the jury was allowed to consider in fixing the damage award was plain error.

The trial court erred by denying the Airport Authority's motions in limine and by allowing Singleton to present its case as though the Ordinance had no effect upon its property. Singleton's experts ignored the Ordinance in their appraisals, and Singleton, in closing, told the jury: "We hear about some ordinance that I've yet to figure out." With the exception of damages for the removal of the trees on Singleton's property penetrating the 34 to 1 approach surface, the trial court erred by permitting Singleton to present evidence of damages from a taking of rights in airspace Singleton did not possess after the

16

promulgation of the Ordinance.  The trial court further erred by permitting Singleton to present evidence of speculative damages from future lower flights over the property and increased noise, vibrations, fumes, and traffic.  As a result of these errors, the trial court allowed Singleton to present an inappropriate measure of damages.

For the reasons stated, we will reverse the judgment of the trial court and remand for a hearing on the limited issue of damages to Singleton's property from the Airport Authority's right to remove the trees obstructing the 34 to 1 approach zone.

<u>Reversed and remanded.</u>