PRESENT:  All the Justices

COMMISSIONER OF HIGHWAYS

OPINION BY
v.  Record No. 170282                                     JUSTICE D. ARTHUR KELSEY
                                                          MAY 10, 2018

KARVERLY, INC.


FROM THE CIRCUIT COURT OF HENRICO COUNTY
James Stephen Yoffy, Judge


In this eminent domain case, the Commissioner of Highways initiated a condemnation

proceeding to acquire a narrow strip of commercial property to create a multi-use trail.  At a trial

to determine just compensation, the trial court allowed the expert witness for the landowner,

Karverly, Inc., to testify that the take caused $193,270 in damages to the remainder.  The court,

however, disallowed the Commissioner's expert witness from testifying that the take caused $0

in damages to the remainder.

A five-member jury returned a split verdict:  Three voted to award $167,866 in damages

to the remainder, and two stated that they "felt that the value of the remainder after take was not

correct, which prevented [them] from agreeing to the damages."  J.A. at 309.  The Commissioner

contends that the majority's award should be vacated and that he should be given the opportunity

to present his expert testimony at a new trial.  We agree.

I.

The Commissioner serves as the "chief executive officer of the Department of

Transportation," Code § 33.2-222, and "is vested with" the power to initiate condemnation

proceedings on behalf of the Commonwealth, Code § 33.2-1001.  In 2014, the Commissioner

filed a certificate of take, and later, a petition for condemnation to acquire a 0.115 acre (5,009.4

square feet) strip of property, J.A. at 21, owned in fee simple by Karverly to create a multi-use trail and for the "reconstruction of Route 5 in Henrico County," *id.* at 313.[1]

Karverly operates a child daycare center on the remainder of the property, which is approximately 5.17 acres. *Id.* at 118. It includes a daycare facility, parking lot, swimming pools, and playgrounds. It has a landscaped buffer of five or six trees and several bushes, and just behind the buffer, a fence. Both the buffer and the fence parallel Route 5 with the buffer positioned closest to the road. The strip of property taken includes the buffer but not the fence. At trial, Karverly argued that it would have to create a new buffer to provide the remainder of the property with privacy and security. The fence, Karverly added, would have to be moved inward to accommodate the new buffer. Both of those changes, Karverly concluded, would in turn require the relocation of the "playscapes" within the playground area as well. *Id.* at 65. The new buffer and the relocation of the fence and playscapes were the sole basis for Karverly's claim for damages to the fair market value of the remainder.

At trial, the Commissioner proffered its expert witness, Joseph Bryan Call, III, who had performed "thousands of appraisals" during his career. *Id.* at 95. Call valued the remaining property's acreage at $2.80 per square foot, and when asked about how he reached this estimate, Call explained that when he

> originally looked at the property, [he] examined the plan sheets, viewed the property, went to the planning office here at the County to look at the approved plan of development for the . . . [daycare] facility; confirmed the availability of utilities at the property with the Utility Department; looked at the Zoning and Planning Office to confirm the zoning and the zoning case that the County had pertinent to the current development, and concluded that the highest and best use of the property as improved was as a continuation of its present day care operation.

---

[1] The take also included a permanent drainage easement ("740.52 square feet, more or less") and a utility easement ("2,614 square feet, more or less"). *Id.* at 21.

*Id.* at 100, 102.[2]  Call then addressed whether the remaining property suffered damage as a result of the take.  "Once [he] looked at everything that [he] could find, to find out the physical, functional and economic characteristics of that property," Call opined, "there was no way in the world that the [remaining] property was damaged in any way."  *Id.* at 102.  Karverly's counsel objected after that statement, and the trial court determined that "it wasn't responsive to the question."[3]  *Id.* at 103.

Call subsequently detailed his findings about the sale of four comparable properties along Route 5, including the sale of Karverly's land, to establish his valuation of the acreage at $2.80 per square foot.  He explained that "[t]he best way to estimate the value of commercial land [was] to go out into the marketplace and identify comparable sales of properties exhibiting the same highest and best use as that concluded for the property under appraisal."  *Id.*  He selected commercial-property sales along the Route 5 corridor "that [had] occurred recently, were similarly zoned, had the same utilities, were physically similar and had the same highest and best use."  *Id.*

Later, when Call was again asked if there were any damages to the remainder of the property, Karverly's counsel again objected.  The trial court was initially "at a loss to say why" Call could not testify that there were "no damages."  *Id.* at 109.  Karverly's counsel argued that,

---

[2] Call also testified about the "cost to cure," which he defined as "a cost to correct something on the property that needs curing."  *Id.* at 101; *see, e.g.*, *State Highway & Transp. Comm'r v. Allmond*, 220 Va. 235, 241, 257 S.E.2d 832, 836 (1979) (referring to cost to cure as "adjustment expenditures" available "as an aid to the condemnation commissioners in their determination of the market values before and after the taking").  He applied the cost to cure to two survey monuments acquired in the take, which Call valued at "$275 each, totaling $550." J.A. at 101.

[3] The trial court did not specify whether it was referring to Call's most recent statement on damages or his entire answer on how he valued the acreage at $2.80 per square foot.

as a matter of law, Call's testimony was inadmissible because he could not offer any opinion on the measure of damages without first preparing an appraisal of the fair market value of the remainder, including improvements, both before and after the take.

Outside of the presence of the jury, the court asked Call whether he valued the remainder and how. Call explained that he did value the remainder and recited statements in his appraisal report:

- "After the acquisition and construction, the remainder will contain 5.17 acres. It will continue to have the same irregular shape as it had before."

- "Grade in relation to the roads will not change. The land will be located at the northeast corner of the intersection formed by Midview and New Market Roads, as before."

- "Same utilities will be available after as before."

- "All of the improvements existing before will remain after."

- "The land will continue to maintain its former B-1(C) zoning."

- "The property can be accessed in the same manner as before."

- "The only difference in the property after as compared to before is the slight reduction of size and the existence of small sliver of permanent drainage and Dominion Virginia easement. Neither of these impact in a detrimental way on the utility or value of the remainder."

*Id.* at 118-19.

Based upon these facts, Call concluded "that the land remainder, if vacant, would have the same highest and best use and value after as compared to before and [that] the property suffer[ed] no diminution as a result of the proposed acquisition." *Id.* at 119. Furthermore, the "[p]roximity of the path" had "no measurable impact on the utility or value contribution of the existing improvements." *Id.* at 120. In other words, Call explained, "whatever value contribution the improvements had in the before instance, they have the same value contribution in the after instance." *Id.* at 119. When Karverly persisted in its objection, the trial court

4

sustained it and held that the Commissioner's counsel could not ask Call if the remaining property was damaged by the take.

Karverly's case-in-chief featured its expert witness, Dennis William Gruelle. To determine the fair market value of the remainder, Gruelle first appraised the fair market value of the property actually taken, both the fee simple and the easements, which he concluded was $34,612. *Id.* at 171. He then deducted that amount from the fair market value of the entire property before the take, including improvements, which he concluded was $3,946,425. *Id.* at 144, 168. Finally, Gruelle calculated the net amount, or the estimated fair market value of the remainder before the take, which he concluded was $3,865,388. *Id.* at 173.

To determine the damages to the remainder, Gruelle estimated the "mitigation costs," which he described as the "costs basically to fix any problems or any changed conditions caused by the taking." *Id.* at 185. These costs included (i) moving the fence 20 feet away from the trail to provide space for a new buffer and (ii) moving the playscapes in the playground area to accommodate the newly positioned fence and the new buffer. Gruelle opined that, absent those modifications, buyers in the market for daycare properties would conclude that the new multi-use trail adjacent to the property created a "functional obsolescence," *id.* at 197-98,[4] rendering the site an "inferior property" and subject to a $290,000 discount in the fair market value of the remainder before the take, *id.* at 198.

---

[4] Under one common definition, functional obsolescence "is caused by a flaw in the structure, materials, or design of an improvement when the improvement is compared with the highest and best use and the most cost-effective functional design requirements at the time of the appraisal." The Appraisal Institute, The Appraisal of Real Estate 623 (14th ed. 2013) [hereinafter The Appraisal of Real Estate]; *see also id.* at 624 tbl.29.4 (describing the types of curable and incurable functional obsolescence); The Appraisal Institute, The Dictionary of Real Estate Appraisal 97 (6th ed. 2015) (defining functional obsolescence as "[t]he impairment of functional capacity of improvements according to market tastes and standards").

Gruelle conceded that he knew of nothing that "legally required" the fence to be moved. *Id.* at 254, 256. This concession was consistent with the parties' stipulation that no local government regulation "require[d] the movement of the fence or the landscaping." *Id.* at 259, 263. In closing argument, Karverly's counsel reiterated that "[n]o one[] ever said that legally [Karverly was] required to move [the] fence." *Id.* at 280.

Lacking any rationale based upon legal compulsion, Gruelle testified that it would nonetheless be prudent to relocate the fence because water runoff from the drainage easement would cause a 2-inch stain on some posts, and a new buffer would provide greater privacy and security for the daycare facility. Moving the fence, Gruelle believed, was something Karverly could not "afford not to do to maintain the value of [the] property," even if it wasn't "mandated to do [so]." *Id.* at 237.

In other words, Gruelle presupposed that buyers in the market for daycare properties would find the new multi-use trail and its potential consequences to be unacceptable — so much so that they would demand a $290,000 discount in the pre-take value of the remaining property if the fence, buffer, and playscapes were not relocated. In support of this assertion, Gruelle cited no industry standards or guidelines adopted by daycare centers. Instead, Gruelle arrived at the $290,000 figure after "talking to appraisers and other real estate experts [and] brokers that actively buy and sell these types of properties." *Id.* at 198.

The trial court instructed the jury on the elements of just compensation, including "the fair market value of the property actually taken" and the "damage, if any, to the owner's remaining property as a result of the taking." *Id.* at 266-67. The court defined "the measure of damages to the owner's remaining property" as "the difference between the fair market value of the property immediately before the taking, and its fair market value after the taking." *Id.* at 269.

6

The court qualified its instruction, stating that the jurors "may consider individual items of damage to the remaining property" but could not "compute the damage to the property by adding those items." *Id.*

The court also instructed the jury on the owner's "duty to minimize any damages to his remaining property" and the jurors' authority to "consider the reasonable expense of adjusting the remaining property to the new conditions in determining the damage to the remaining property if such expenditures [would] minimize damages that would otherwise occur." *Id.* at 269-70. These minimization costs could be considered to the extent that they affected "the difference between the values before and after the taking" but could not be considered as "independent and distinct items of damage." *Id.* at 270.

A five-member jury returned a split verdict.[5] All five jurors awarded $29,181 in compensation for the narrow strip of property acquired by the Commissioner. On the issue of damages to the remainder, three jurors issued a majority report awarding $167,866 in residual damages.[6] Two jurors issued a minority report stating that they "felt that the value of the remainder after take was not correct, which prevented [them] from agreeing to the damages." *Id.* at 309. The trial court accepted the majority report in full and entered final judgment.

## II.

On appeal, the Commissioner contends that the trial court erred by excluding Call's testimony on the ground that it offended settled valuation law governing damages to the remainder. *See* Appellant's Br. at 2. This evidentiary error, the Commissioner contends, rose to

---

[5] Karverly elected to proceed with the empanelment of a jury rather than the appointment of commissioners to determine the issue of just compensation. *See* Code § 25.1-213; J.A. at 41.

[6] It is not immediately apparent from the record why the jury reduced Gruelle's estimation for damages from $193,270 to $167,866 — a $25,404 difference.

the level of an abuse of discretion because it denied the Commissioner the ability to present admissible evidence on the core issue at trial.[7]  We agree.

A.

Though initially reluctant to do so, the trial court excluded Call's testimony on residual damages based upon the following syllogism offered by Karverly.  First, a landowner can show damage to the remainder only by proving that the fair market value after the take was less than the fair market value before the take.  Second, Call did not value the remainder after the take because he failed to determine the fair market value of all the property, including improvements.  Thus, Call's testimony that the remainder of the property sustained no damages was inadmissible on its face.

We agree with Karverly's first premise.  "In every eminent domain case involving a partial taking, the measure of damages to the residue of the property not taken is the difference in the fair market value of the residue immediately before and immediately after the taking."  *City of Virginia Beach v. Oakes*, 263 Va. 510, 516, 561 S.E.2d 726, 728-29 (2002).[8]  "In ascertaining

---

[7] "[T]he admissibility of evidence is within the discretion of the trial court and [this Court] will not reject the decision of the trial court unless we find an abuse of discretion." *Midkiff v. Commonwealth*, 280 Va. 216, 219, 694 S.E.2d 576, 578 (2010).  But when the trial court's decision is "influenced by [a] mistake of law," it is an abuse of discretion. *Martin v. Lahti*, 295 Va. 77, 88, 809 S.E.2d 644, 650, (2018) (citation omitted).  "'Discretion,' observed Lord Mansfield, C.J., in *R. v. Wilkes*, 'when applied to a court of justice, means sound discretion guided by law.'"  Herbert Broom, Commentaries on the Common Law 22 (4th ed. 1869) (footnote omitted).

[8] *See also Virginia Highlands Airport Auth. v. Singleton Auto Parts, Inc.*, 277 Va. 158, 169-70, 670 S.E.2d 734, 740 (2009); *Commonwealth Transp. Comm'r v. Glass*, 270 Va. 138, 154, 613 S.E.2d 411, 420 (2005); *Revocor Corp. v. Commonwealth Transp. Comm'r*, 259 Va. 389, 394, 526 S.E.2d 4, 7-8 (2000); *WAMMCO, Inc. v. Commonwealth Transp. Comm'r*, 251 Va. 132, 137, 465 S.E.2d 584, 586 (1996); *Chappell v. Virginia Elec. & Power Co.*, 250 Va. 169, 172, 458 S.E.2d 282, 284 (1995); *Lynch v. Commonwealth Transp. Comm'r*, 247 Va. 388, 391, 442 S.E.2d 388, 390 (1994); *East Tenn. Nat. Gas Co. v. Riner*, 239 Va. 94, 100, 387 S.E.2d 476, 479 (1990); *State Highway & Transp. Comm'r v. Linsly*, 223 Va. 437, 443, 290 S.E.2d 834, 838 (1982); *Allmond*, 220 Va. at 241, 257 S.E.2d at 836; *State Highway & Transp. Comm'r v. Parr*,

such damages, both present and future circumstances which actually affect the value of the property at the time of taking may be considered, but remote and speculative damages may not be allowed." *Id.*

Within the general category of "circumstances which actually affect the value of the property at the time of taking," *id.* at 516, 561 S.E.2d at 728, our cases fall within two subcategories: (1) circumstances of the take that diminish the remainder's fair market value, which the landowner could not remediate with an out-of-pocket expense, and (2) circumstances of the take that diminish the remainder's fair market value in the absence of an out-of-pocket expense.[9]

An example of the former includes a take severing a landowner's riparian rights.[10] An example of the latter includes a take requiring the relocation of a roadway in order to maintain

---

217 Va. 522, 524, 230 S.E.2d 253, 255 (1976); *Appalachian Power Co. v. Anderson*, 212 Va. 705, 708, 187 S.E.2d 148, 152 (1972); *Dressler v. City of Covington*, 208 Va. 520, 522 n.1, 158 S.E.2d 660, 662 n.1 (1968); *Colonial Pipeline Co. v. Lohman*, 207 Va. 775, 781, 152 S.E.2d 34, 39 (1967); *State Highway Comm'r v. Crockett*, 203 Va. 796, 800, 127 S.E.2d 354, 357 (1962); *Ryan v. Davis*, 201 Va. 79, 82, 109 S.E.2d 409, 412 (1959); *Appalachian Elec. Power Co. v. Gorman*, 191 Va. 344, 353, 61 S.E.2d 33, 37 (1950); *Long v. Shirley*, 177 Va. 401, 410, 14 S.E.2d 375, 379 (1941); *Chairman of the Highway Comm'n v. Fletcher*, 153 Va. 43, 47, 149 S.E. 456, 457 (1929); *Chairman of the Highway Comm'n v. Parker*, 147 Va. 25, 29, 136 S.E. 496, 498 (1927); *Town of Galax v. Waugh*, 143 Va. 213, 229-30, 129 S.E. 504, 508-09 (1925); *Swift & Co. v. City of Newport News*, 105 Va. 108, 121-22, 52 S.E. 821, 826 (1906); *Richmond & Mecklenburg R.R. Co. v. Humphreys*, 90 Va. 425, 435-36, 18 S.E. 901 (1894).

[9] *Cf.* The Appraisal of Real Estate, *supra* note 4, at 615 fig.29.2, 617-626 (categorizing physical deterioration and functional obsolescence, measures of depreciation, into subsets of curability and incurability).

[10] *See, e.g.*, *Lynnhaven Dunes Condo. Ass'n v. City of Virginia Beach*, 284 Va. 661, 675, 733 S.E.2d 911, 918 (2012) (holding that the severance of riparian rights was a compensable taking because the severance was not "sufficiently related to the efforts to regulate and improve navigation"). *See generally* 4A Julius L. Sackman, et al., Nichols on Eminent Domain § 14A.07[1], at 14A-116 to -119 (3d rev. ed. 2004) (discussing just compensation for temporary and permanent takings involving littoral and riparian rights).

the industrial zoning status of the remainder of a property.[11]  A take that renders "the most advantageous use of the remaining land . . . unavailable to the condemnee in the after condition without replacing some of the improvements lost," 4A Julius L. Sackman et al., Nichols on Eminent Domain § 14A.04[3], at 14A-79 (3d rev. ed. 2004), also falls within this subcategory.[12]

The dispute in this case involves the second subcategory of circumstances that affect the value of the remainder.  Karverly's expert, Gruelle, testified that the landscaped buffer needed to be moved, which required the fence and thus the playscapes to be moved.  Absent incurring these "adjustment costs," as they are "commonly" called,[13] *Revocor Corp. v. Commonwealth Transp. Comm'r*, 259 Va. 389, 394, 526 S.E.2d 4, 8 (2000), the remaining property would have a lower fair market value than it had before the take.  Gruelle totaled these adjustment costs[14] and the

---

[11] *See, e.g.*, *Revocor Corp.*, 259 Va. at 396, 526 S.E.2d at 9; *see also Department of Transp. v. Fairbrook Bus. Park Assocs.*, 244 Va. 99, 100, 418 S.E.2d 874, 875 (1992) (discussing a take that rendered the remainder in violation of a zoning ordinance unless the landowner developed its property in such a way to meet the development requirements of the ordinance).

[12] *See, e.g.*, *City of Staunton v. Aldhizer*, 211 Va. 658, 661, 179 S.E.2d 485, 488 (1971) ("It is well settled that the cost of fencing and like expenses necessary to adjusting the landowner's property to the new situation created by the construction of a highway are proper elements of damages." (citation omitted)); *Long v. Shirley*, 177 Va. 401, 415, 14 S.E.2d 375, 381 (1941); *Richmond v. Williams*, 114 Va. 698, 702-03, 77 S.E. 492, 494 (1913); *Heninger v. Peery*, 102 Va. 896, 900-01, 47 S.E. 1013, 1015 (1904); 2 John A. Lewis, Treatise on the Law of Eminent Domain in the United States § 741, at 1316-17 (3d ed. 1909).

[13] "Adjustment costs are relevant when determining any diminution in the market value of the residue as a result of the taking.  Such costs, however, are 'not the measure of damages and cannot be recovered specifically,'" which means that "evidence of the actual cost of necessary improvements is admissible as a factor of evaluation, though not as a measure of damages." *Revocor Corp.*, 259 Va. at 394-95, 526 S.E.2d at 8 (citation omitted); *see also WAMMCO, Inc.*, 251 Va. at 137-38, 465 S.E.2d at 586-87; *Dressler*, 208 Va. at 522-23, 158 S.E.2d at 622; *Gorman*, 191 Va. at 353-54, 61 S.E.2d at 38; *Fletcher*, 153 Va. at 50-51, 149 S.E. at 458.

[14] Gruelle referred to "mitigation" costs and "adjustment" costs interchangeably. *See, e.g.*, J.A. at 183, 185-86, 198.  Mitigation costs have been described as expenses that, "if made, would diminish the damages" to the value of the remainder of a take, and "it is ordinarily the duty of owners of property taken . . . to minimize their damages." *Bradshaw v. State Highway*

"contingency" costs for the temporary loss of use of the affected property in order to implement the changes[15] and reached an estimate of $193,270 in damages. *See* J.A. at 195-97; Def.'s Ex. 8. Gruelle came to this conclusion based on the supposition that, absent these mitigation measures, buyers in the market for daycare properties would deem the site an "inferior property" and "pay less for it because of that." J.A. at 198. Gruelle gave this view of market sentiment the name "functional obsolescence" and stated that it required a $290,000 discount in the pre-take fair market value of the remainder. *Id.* at 197-98. He arrived at this figure after "talking to appraisers and other real estate experts, [and] brokers that actively buy and sell these types of properties." *Id.* at 198.

Gruelle stated that he "followed the accepted appraisal methodology in performing his appraisal,"[16] *id.* at 200, but cited no other sources, such as legal codes, published surveys, or industry literature, in support of his belief that the take, absent the relocation of improvements, would render any part of the remainder of the property functionally obsolete.[17] Nor does the

---

*Comm'r*, 210 Va. 66, 68, 168 S.E.2d 129, 130 (1969). Adjustment costs have been described as "the expense[s] made necessary by reason of the improvement in adjusting the property to the changed conditions brought about by the taking." *Dressler*, 208 Va. at 522-23, 158 S.E.2d at 662. Mitigation costs, like adjustment costs, may only be considered "as elements bearing on the difference between values before and after the taking" and "not as independent and distinct items of damage." *Bradshaw*, 210 Va. at 68, 168 S.E.2d at 130.

[15] Gruelle testified without objection that he arrived at the contingency costs by taking a "half of one percent" of a number that we have not found in the record. Gruelle applied this percentage to account for the "additional impacts caused by when you move everything in," including the reduction in "the play area overall" and the "restrict[ion] [on] some of the activities" until everything is "put back in place" and "all the inspections have been done." J.A. at 196.

[16] Virginia permits licensure to operate as an appraisal management service if, among other requirements, "the appraisal services are being conducted in accordance with the Uniform Standards of Professional Appraisal Practice." Code § 54.1-2021.1(B)(2)(i).

[17] *See generally* Appraisal Foundation, Uniform Standards of Professional Appraisal Practice 16 (2018-2019) ("When appraising proposed improvements, an appraiser must examine and have available for future examination, plans, specifications, or other documentation

record clearly show why Gruelle chose to apply the 7.5 percent depreciation and 12 percent depreciation on the improvements and overall property that produced his estimate of $290,000 in financial impact of that obsolescence on the fair market value of the remainder after the take.

The Commissioner's expert, Call, rejected Gruelle's assumptions and asserted that no adjustment costs were necessary. *See id.* at 124. By concluding (i) that "the land remainder, if vacant, would have the same highest and best use and value after as compared to before," *id.* at 119, and (ii) that the "[p]roximity of the path . . . ha[d] no measurable impact on the utility or value contribution of the existing improvements," *id.* at 120, Call necessarily rejected the assumption that buyers in this market would either condition the operation of the property as a daycare center on the relocation of improvements or deduct any amount from the fair market value of the remainder if no such changes were made.

Call explained that he "*looked at everything* that [he] could find, to find out the *physical, functional and economic characteristics* of that property," and concluded that "there was no way in the world that the [remainder] was damaged in any way." *Id.* at 102 (emphases added). Call rejected the assertion that the remainder would be functionally obsolete because he rejected the first and indispensable predicate for doing so — that there was any dependable basis for the supposition that buyers in the market for daycare properties would require the relocation of the fence, the buffer, or the playscapes.

We see the contest between these competing experts as a legitimate dispute over which rational factfinders could reasonably disagree. *See generally Du v. Commonwealth*, 292 Va. 555,

_____

sufficient to identify the extent and character of the proposed improvements."); The Appraisal of Real Estate, *supra* note 4, at 581 ("To apply the cost approach to value, appraisers estimate the cost of the improvements as of the effective date of appraisal. To prepare this sort of estimate, appraisers need to understand construction plans, specifications, materials, and techniques . . . . Proposed improvements may be valued based on plans and specifications . . . .").

12

564, 790 S.E.2d 493, 499 (2016). Even without Call's testimony, only three of the five jurors awarded damages to the remainder. By curtailing the Commissioner's expert opinion, however, the trial court unleveled the playing field, allowing one expert to opine on the necessity of the relocation of improvements to avoid functional obsolescence, while barring another expert from establishing that there was a "net zero" difference in the "value contribution [of] the improvements" before or after the take, J.A. at 119.

## B.

Karverly offers several rejoinders to our view of this dispute. First, Karverly argues that "Call's opinion depends on an assumption of fact that the jury rejected: the hypothesis that the drainage easement did not detrimentally affect 'the utility or value of the remainder.'" Appellee's Br. at 6 (citation omitted). We find this argument unpersuasive. The fact that a majority of the jury found damages to the remainder could not mean that they rejected Call's opinion that there were none. How could they, having never heard his opinion on that subject?[18] The jury only heard Gruelle's testimony on damages, which two of the five jurors rejected because they determined that the estimate of damages to the remainder was "not correct." J.A. at 309.

Perhaps Karverly's point focuses narrowly on Gruelle's view of the stained fence posts.[19] If so, we reject it as too narrow. Gruelle's principal assertion was that a landscaped buffer was

---

[18] Call proffered that the drainage easement did not "impact in a detrimental way on the utility or value of the remainder." J.A. at 119.

[19] Karverly's brief on appeal states that, during a view of the property, the jury "had the opportunity to see the water-stained fence and the area where mulch had washed away" in some area of the easement. Appellee's Br. at 3 (citing J.A. at 281). This statement cites counsel's closing argument, which is not evidence. *See* Charles E. Friend & Kent Sinclair, The Law of Evidence in Virginia § 1-4[i], at 32 (7th ed. 2012) (stating that closing "arguments are not evidence"). Karverly points us to no place in the record where Gruelle testified specifically about the condition of the mulch or where Karverly introduced a photograph or exhibit proving the extent of the stains or the condition of the mulch.

13

essential to maintain the property's existing fair market value, and thus, the fence and playscapes had to be moved to accommodate a new buffer. *See id.* at 185-86. We think it improbable that the 3-2 vote of the jury awarded $167,866 in damages based upon a finding of a 2-inch runoff stain on some fence posts.

Second, Karverly argues that Call's opinion on the absence of damage to the remainder should be disregarded as mere "ipse dixit" because Call failed to understand that "[t]he law provides a formula and directs the factfinder to use it: Before value – after value = damages." Appellee's Br. at 7. Karverly argues that Call did not apply this formula because he failed to "do the math" as directed in other cases involving eminent domain. Oral Argument Audio at 10:40 to 10:46. We find this criticism unconvincing. The issue here is not the arithmetic but the presuppositions preceding it.

Both Call and Gruelle assumed that the fair market value of the remaining property would remain exactly the same before and after the take *unless* adjustment costs for the improvements were necessary to maintain the fair market value of the remainder.[20] In Call's

_____

[20] The only difference in Gruelle's valuation of the remainder in his pre-take appraisal and his post-take appraisal is that he subtracted the adjustment costs from the value of the remainder after the take. *See* J.A. at 201. Gruelle does not explicitly mention any other variable with which he calculated the value of the remainder after the take. *See id.* ("The value of the remainder after the take . . . with the adjustment cost of [$]170,000, gives you [$]3,672,118."). Both of his appraisals "value[d] the entire property including the improvements," *id.* at 144, and both were performed "as of that same date" to capture that day's fair market value, *id.* at 143.

Consider again Karverly's equation ($x - y = z$), which treats "x" as the pre-take value, "y" as the post-take value, and "z" as damages. *See* Appellant's Br. at 7 ("Before value – after value = damages."). Karverly asserts that one cannot know "z" if he fails to calculate "y." That is true as far as it goes. But if "x" and "y" have the same value, "z" is zero. To be sure, if "x" and "y" are identical in value, it does not matter what that precisely measured value might be — "z" is *still* zero. Gruelle determined the value of "y" not by introducing a new variable, but by reducing the measured value of "x" by his estimated functional-obsolescence discount. Call rejected that discount as unsupportable and consequently found that "y" was identical to "x." Gruelle and Call thus followed the same equation. They just disagreed on the presence or absence of a discount for functional obsolescence, a concept that has intrinsic subjective

14

proffered opinion, the multi-use trail "ha[d] no measurable impact on the utility or value contribution of the existing improvements," J.A. at 120, and thus, there was no basis upon which to assume the functional obsolescence of the property. Gruelle disagreed. Based on his conversations with other "experts" on this subject, *id.* at 198, Gruelle concluded buyers would find the remaining property functionally obsolete because they would require the fence to be relocated to accommodate a new buffer and the playscapes to be relocated to accommodate the relocated fence and the new buffer.

In short, Gruelle identified no verifiable, objective basis for finding functional obsolescence. The functional-obsolescence assertion was wholly dependent upon Gruelle's experience and his conversations with other experts. A similar observation can be made of Call's rejection of Gruelle's assumption. Call said he "looked at everything" he could find concerning the "physical, functional and economic characteristics" of the property, which persuaded him that "there was no way in the world" the take damaged the remainder. *Id.* at 102. In this respect, both experts worked from the same analytical template because both understood that the only variation between the value of the remainder before and after the take was the hypothesized necessity to incur adjustment costs. Gruelle opined that there were such costs; Call opined that there were none. The jury should have heard from both experts before being asked to decide this case.

---

qualities. *See Forest Hills Coop. v. City of Ann Arbor*, 854 N.W.2d 172, 183 (Mich. Ct. App. 2014) ("The measure of allowable obsolescence is a subjective determination that demands an exercise of judgment. 'Even a slight variation in the percentage of depreciation or of obsolescence may produce a considerable difference in valuation.'" (citations omitted)); *Lewis v. County of Hennepin*, 623 N.W.2d 258, 263 (Minn. 2001) (acknowledging the "difficulty in determining functional obsolescence").

15

III.

In sum, the trial court erred by excluding Call's testimony.  Call should have been given an opportunity to explain to the jury why he concluded that the remainder suffered no damages, just as Gruelle was given the opportunity to explain why he reached the opposite conclusion. Thus, we will reverse the final judgment and remand the case for retrial.

*Reversed and remanded.*