PRESENT:  All the Justices

DEBRA K. SHUMATE

v.  Record No. 180012

OPINION BY
JUSTICE WILLIAM C. MIMS
December 20, 2018

TERRI MITCHELL, EXECUTRIX AND
PERSONAL REPRESENTATIVE OF
THE ESTATE OF WILLIAM EARL THOMPSON

FROM THE CIRCUIT COURT OF ROANOKE COUNTY
James R. Swanson, Judge

In this appeal, we consider whether Virginia's Dead Man's Statute, Code § 8.01-397,

permits admission of a decedent's hearsay statements offered by the defense in a personal injury

action brought against the decedent's estate.  We also consider whether the circuit court erred in

refusing to vacate the jury's verdict of no damages when the estate conceded liability.

I.  BACKGROUND AND MATERIAL PROCEEDINGS BELOW

When reviewing a circuit court's refusal to set aside a jury's verdict for the defense on

damages, this Court views the evidence in the light most favorable to the defense as the

prevailing party below.  *See Gilliam v. Immel*, 293 Va. 18, 20–21 (2017) ("Because [the

defendant] prevailed on the issue of damages, we review the evidence on that issue in the light

most favorable to him.").  So viewed, the evidence is as follows.

Debra Shumate filed suit seeking damages from an October 18, 2011 automobile

collision with a car driven by William Earl Thompson.  She originally sued Thompson, but

amended the complaint to substitute his estate's personal representative upon learning that he

had passed away from unrelated causes.  The estate conceded liability, and the trial was limited

to the issue of damages.  Prior to trial, Shumate filed a motion in limine to exclude testimony

regarding Thompson's description of the collision to his two sons.  Shumate argued that because

neither son witnessed the collision, his statements would be inadmissible hearsay not cured by the Dead Man's Statute. The circuit court overruled Shumate's motion.

The evidence presented at trial established that Shumate was stopped at a traffic light when she observed a sports car driven by Thompson moving toward the rear of her sedan. She applied the brake in anticipation of the collision and put her arm in front of her son, Joey, who was riding in the passenger seat. Joey described the impact as a "hard slam" and said he saw Shumate go forward and hit her head. Shumate testified that the collision was so violent she was afraid Joey would "go through the windshield" and that Thompson's "little car had went [sic] underneath" her sedan. Joey called 911. First responders arrived shortly thereafter and transported Shumate to the emergency room.

Shumate provided varying estimates of Thompson's speed. At the emergency room, she reported that his car rear-ended her at approximately thirty-five miles per hour. She told a physician she visited two days later that she was struck at forty miles per hour. At trial, she testified that Thompson's car was traveling at least twenty miles per hour.

Donald Bowman, who was riding with Thompson, described a milder collision:

> Traffic stopped. We stopped. And the traffic started moving and
> [Thompson] let the clutch out and I guess he pushed it back in and
> he just run five or six miles an hour, and I looked over there and all
> of a sudden hit a bump, hit the car. . . . [The impact] didn't even
> move me or hurt me or anything, didn't jar me or nothing.

Thompson's son, Billy, testified that his father described the collision as occurring in stop-and-go traffic. According to Billy, as traffic began moving forward Thompson eased off the brake, checking his mirrors, but Shumate's sedan had stopped in front of him. Thompson's car "bumped" the sedan at "[f]ive to seven miles an hour."

Bowman stepped out of the sports car after the collision and viewed the scene. He testified that he did not see a dent in the rear of Shumate's sedan, but that some paint had been transferred from the sports car's nose to the sedan's rear bumper. Billy, who had helped build Thompson's sports car, identified the only damage as a small dent in the thin aluminum trim and some cracking in the car's fiberglass nose.

Shumate has been injured in three automobile accidents prior to the collision at issue here. In 1993, a vehicle struck her car at around fifty-five miles per hour, resulting in her losing consciousness and suffering arm, leg, and lower back pain. She was rear-ended in 2001, causing injuries to her neck, knee, and right ankle. And in 2007, she was a passenger in a vehicle that ran off the road causing "immediate pain in [her] neck and back."

In June 2011, four months before the collision, Shumate visited a pain management clinic complaining of "intense, miserable, and needle[-]like" neck pain that affected her sleep. The physician's notes record that Shumate attributed the pain to the 2007 car accident and that she previously underwent two surgical procedures to alleviate the pain. She visited the same clinic in August 2011 complaining of the same neck pain symptoms, which she rated as "6 to 7 out of 10" in intensity. Medical records indicate that Shumate was "still tak[ing] morphine" for the pain on September 27, 2011 and that she underwent a cervical facet nerve block procedure on October 3, 2011—just five days prior to the collision—in an effort to limit her pain.

Nine days after the collision, on October 27, 2011, Shumate again presented at the pain management clinic where she reported the nerve block procedure "did not provide her with any substantial relief" from her pain, which she continued to rate at a "6 to 7 out of 10." Notably, the physician's notes from the October 27 appointment contain no reference to the October 18, 2011 collision.

3

Shumate underwent a third spine surgery in March 2012. The surgeon who performed that procedure testified that Shumate reported the same pain level before and after the 2011 collision at issue in this case and that this pain was the reason for the surgery. The surgeon also reported that Shumate had preexisting degenerative changes in her neck and spine not attributable to the 2011 collision. She underwent a fourth spine surgery in March 2017 to revise one of the pre-2011 surgeries. That surgeon attributed the need for this surgery to the 2011 collision based on Shumate's report that her pain symptoms originated with it and that "[s]he was doing very well prior to" it.

The estate called Dr. Sander Leivy, a neurosurgeon, as its medical expert. Leivy did not personally examine Shumate. After reviewing all of her medical records, he testified that she was not injured in the 2011 collision. He testified that her pain complaints resulted from degenerative conditions in her spine predating the collision and that this degeneration, not the collision, necessitated her subsequent surgeries. Leivy stated that he did not believe any of Shumate's medical expenses after the collision were attributable to it "except for going to the ER the day of the accident to make sure something wasn't injured" because "that makes sense." Shumate ultimately submitted an itemized listing of $197,157.50 in medical expenses in support of her claim for $500,000 in damages.

At the conclusion of all evidence, the circuit court instructed the jury that because the estate had conceded liability, "the only issue that you have to decide is the amount of damages, if any, the plaintiff is entitled to recover. An admission of liability should not influence you in any way in considering the issue of damages." It further instructed: "The issue in this case is, if the plaintiff is entitled to recover, what is the amount of her damages. On this issue the plaintiff has the burden of proof." Another instruction stated that "[i]f you find your verdict for the plaintiff,

4

then in determining the damages to which she is entitled you shall consider the following which you believe by the greater weight of the evidence was caused by the negligence of defendant." It then listed various factors.

The jury returned a unanimous verdict for the plaintiff and fixed her compensatory damages "at zero dollars." Shumate moved to set aside the verdict as contrary to the law and evidence and received leave to brief the issue. She argued in her brief that uncontradicted evidence, including Leivy's testimony that the emergency room visit made sense, established that a verdict of no damages was inappropriate. She further contended that Billy's testimony recounting Thompson's out-of-court statements was inadmissible hearsay not cured by the Dead Man's Statute because that statute did not apply when a live witness—namely Bowman—was available to testify as an eyewitness. The circuit court overruled Shumate's motion to reconsider and entered final judgment over her objection.

We granted Shumate's appeal.

## II. ANALYSIS

Shumate raises two assignments of error: the circuit court misapplied Virginia's Dead Man's Statute and it erred in refusing to set aside the jury's verdict of no damages.

### A. The Dead Man's Statute

Shumate first contends that the circuit court erred in admitting Billy's testimony recounting Thompson's description of the collision because it constituted hearsay to which the Dead Man's Statute does not apply. She further argues that the statute's language precludes its application to nonliability issues. Finally, she contends that even if it did apply, Billy's testimony was not corroborated as required by a pretrial ruling. Although we review evidentiary rulings for abuse of discretion, *Commissioner of Highways v. Karverly, Inc.*, 295 Va. 380, 388

5

n.7 (2018), this case involves review of the circuit court's interpretation of the Dead Man's Statute. Thus its ruling is subject to de novo review. *Lewis v. Commonwealth*, 295 Va. 454, 460 (2018).

   1. Development of Virginia's Dead Man's Statute

   Virginia's current Dead Man's Statute provides, in pertinent part:

> In an action by or against a person who, from any cause, is incapable of testifying, or by or against the committee, trustee, executor, administrator, heir, or other representative of the person so incapable of testifying, no judgment or decree shall be rendered in favor of an adverse or interested party founded on his uncorroborated testimony. In any such action, whether such adverse party testifies or not, all entries, memoranda, and declarations by the party so incapable of testifying made while he was capable, relevant to the matter in issue, may be received as evidence in all proceedings including without limitation those to which a person under a disability is a party.

Code § 8.01-397. It is also codified verbatim as Virginia Rule of Evidence 2:804(b)(5). It has remained essentially the same since the General Assembly enacted its current form in 1919. An overview of how the treatment of interested witnesses at common law evolved over time, leading to the enactment and refinement of dead man's statutes in many American jurisdictions, is instructive to the Court's resolution of this case.

   Dead man's statutes were enacted in response to the common-law rule disqualifying every witness interested in a case. *See Epes v. Hardaway*, 135 Va. 80, 84 (1923); 1 McCormick on Evidence § 65, at 432 (Kenneth S. Broun, ed., 7th ed. 2013). However, uniform disqualification for interest was not necessarily an immutable common-law principle. The jury trial began developing into a modern form recognizable to today's lawyers during the mid-to-late 1400s when witnesses with knowledge of disputed facts began testifying to juries; prior to that time, juries used their own knowledge and extrajudicial investigation in deciding causes. 2 John

6

Henry Wigmore, Wigmore on Evidence § 575, at 800–01 (James H. Chadbourn, ed., rev. ed. 1979). No disqualification for interest existed during this period. Sir John Fortescue, Chief Justice of the King's Bench, noted no witness limitations in his influential treatise on English law written circa 1470, observing that "each of the parties has a liberty to produce before the Court all such witnesses as they please, or can get to appear on their behalf." John Fortescue, De Laudibus Legum Angliae 89 (A. Amos trans., 1775).

By the mid-1600s, disqualification of interested witnesses had become widespread. *See* Wigmore, *supra*, § 575, at 804 & 808 n.38. Commentators offer various explanations for this shift. The likeliest is that the disqualification of interested nonparties developed organically from disqualification of the parties themselves, itself a vestige from a time when compurgation[1] and other older modes of trial were being displaced by what would become the modern jury trial. *Id.* § 575, at 806–08. Because party oaths were associated with compurgation, parties were thereby excluded from testifying in early jury trials. *See King v. Hopkins*, 57 N.H. 334, 367 (1876) ("I have already alluded to the fact in the history of the jury trial, that one great purpose of its introduction was the exclusion of the parties as witnesses."). Given this background, the rule excluding interested nonparty witnesses did not develop out of sound policy concerns, but rather doctrinal creep as "the rule for a party was extended by analogy to interested persons in general." Wigmore, *supra*, § 575, at 807.

To the extent any reasoning supported disqualifying interested witnesses, it can be stated in syllogistic form:

---

[1] Under this primitive form of trial also known as a wager of law, a party defending against allegations could gain acquittal by swearing his innocence along with a certain number of oath helpers. Compurgation was widely regarded as "easier and safer than the jury" because it was the only form of trial in which a party could benefit from his own oath. James Bradley Thayer, Preliminary Treatise on Evidence at the Common Law 24–27 (1898).

7

> Total exclusion from the stand is the proper safeguard against a false decision, whenever the persons offered are of a class specially likely to speak falsely; persons having a pecuniary interest in the event of the cause are specially likely to speak falsely; therefore such persons should be totally excluded.

*Id.* § 576, at 810. Both premises are suspect: pecuniary interest does not necessarily imply a tendency toward dishonesty, and even assuming it did, barring interested testimony does not preclude, and may actually lead to, false decisions. This indiscriminate rule and its shaky foundations invited widespread criticism, leading England to abolish the common-law prohibition of interested witnesses by statute in 1851. Supreme Court of Judicature Act, 1851, 14 & 15 Vict., ch. 99 (Eng.). A parallel movement, spearheaded by David Dudley Field's procedural reform efforts in New York, resulted in most American jurisdictions similarly abolishing interest as a disqualification by the turn of the twentieth century. Wigmore, *supra*, § 576, at 817.

Whereas the English abolition was total, American reformers ultimately allowed the disqualification rule to persist in cases where one party to a transaction had died but the other survived. The argument was that an estate might be subjected to fabricated claims against which it could not defend if surviving parties or similarly interested persons could testify about a transaction with one whose lips had been sealed by death. Nearly every state legislature found this position persuasive, codifying an exception for cases involving transactions with persons since deceased in statutes that otherwise abolished the common-law rule disqualifying interested witnesses. McCormick, *supra*, § 65, at 432. Thus did dead man's statutes proliferate.

Virginia retained the common-law disqualification until the General Assembly abolished it in 1866. *See Epes*, 135 Va. at 84. As amended during the next legislative session, that act contained the earliest form of Virginia's Dead Man's Statute:

8

> [W]here one of the original parties to the contract or other
> transaction which is the subject of the investigation, is dead, or
> insane, or incompetent to testify by reason of infamy, or any other
> legal cause, the other party shall not be admitted to testify in his
> own favor, or in favor of any other party having an interest adverse
> to that of the party so incapable of testifying, unless he shall be
> first called to testify on behalf of such last mentioned party.

*Id.* at 84–85, n.† (quoting 1866–67 Acts, ch. 170). This early Dead Man's Statute simply excluded testimony from a survivor to a transaction with a decedent or otherwise incapacitated person. *Id*. at 84. The statute proved to be "far from perfect" and required amendment "to meet the hardships of different cases as developed by the decisions of this [C]ourt." *Id.* at 85. One case proved so inequitable that in 1904 the legislature grafted an additional exception onto the statute, permitting the survivor to testify when "some person, having an interest in or under such contract or transaction, derived from the party so incapable of testifying, has testified in behalf of the latter or of himself, as to such contract or transaction." *Id.* at 86 (quoting Code § 3346 (1904)).

Even with this exception, the strict prohibition of survivor testimony proved overbroad, prompting the General Assembly to enact a new version of the Dead Man's Statute when it recodified Virginia's statutory law in 1919:

> In an action by or against a person who, from any cause, is
> incapable of testifying, or by or against the committee, trustee,
> executor, administrator, heir, or other representative of the person
> so incapable of testifying, no judgment or decree shall be rendered
> in favor of an adverse or interested party founded on his
> uncorroborated testimony; and in any such action or suit, if such
> adverse party testifies, all entries, memoranda, and declarations by
> the party so incapable of testifying made while he was capable,
> relevant to the matter in issue, may be received as evidence.

Code § 6209 (1919). As this Court observed shortly after the revisions, "[t]his section of the Code is new and was intended to remove all disqualifications affecting the competency of

9

witnesses in suits by or against the estates of persons laboring under disability or who are from any cause incapable of testifying." *Arwood v. Hill*, 135 Va. 235, 241 (1923). The revisors believed that the new corroboration requirement, combined with the right of cross-examination, would provide adequate protection for the incapacitated person or decedent's estate. *Id.*; *see also* Code § 6209 (1919) revisors' note.

2. The Current Dead Man's Statute

With minimal amendments, the 1919 statute remains in effect. The current statute's first sentence is identical to the independent clause before the semicolon in the 1919 statute, preserving the corroboration requirement.[2] The current statute's second sentence modifies the latter part of the 1919 statute, changing the conditional phrase "if such adverse party testifies" into a broad hearsay exception admitting all "entries, memoranda, and declarations" of a decedent or incapacitated person regardless of whether the survivor testifies. Code § 8.01-397. This provision, as Professor Sinclair observes, is a "sweeping abolition of hearsay principles" for which neither the General Assembly nor this Court has ever offered an explanation. Kent Sinclair, The Law of Evidence in Virginia § 10-7[f], at 605 (8th ed. 2018).

---

[2] In 1923, this Court in *Epes* held that the corroboration exception enacted by the General Assembly in 1904 remained in effect even though it did not appear in the text of the 1919 recodification. *See Epes*, 135 Va. at 87–91. Thus, survivor testimony was permitted when another interested party—that is, someone with a "pecuniary interest in the outcome of the litigation" whose interest derives from the decedent or incapacitated person—testified on behalf of the incapacitated party. *See Johnson v. Raviotta*, 264 Va. 27, 34 (2002). In *Johnson*, we cited the holding in *Epes* to hold that the 1904 statutory exception continues to operate as an exception to the corroboration requirement under the current Dead Man's Statute because that requirement "applied 'only to that class of witnesses who were made competent for the first time by the Code of 1919, and that, no corroboration is required of those witnesses who were competent before the Code of 1919 became operative, and who did not then require corroboration.'" *Id.* at 34 (quoting *Epes*, 135 Va. at 92–93).

10

In the decades following enactment of dead man's statutes, courts and commentators alike debated the effectiveness of dead man's statutes generally and questioned whether such legislation was actually an improvement on the common-law prohibition against interested witnesses. *See, e.g.*, *Cockley Milling Co. v. Bunn*, 79 N.E. 478, 479 (Ohio 1906) (noting that "the exceptions are equally indefensible with the original rule" barring interested witness testimony); *St. John v. Lofland*, 64 N.W. 930, 931 (N.D. 1895) ("Statutes which exclude testimony on this ground are of doubtful expediency. There are more honest claims defeated by them by destroying the evidence to prove such claim than there would be fictitious claims established if all such enactments were swept away, and all persons rendered competent witnesses."); Dwight G. McCarty, Psychology for the Lawyer 300 (1929) ("It is quite generally recognized that the statute is very conducive to perjury and fraudulent collusion. People resent being prevented from proving the facts by such an artificial device, and feel justified in getting around it if they can."); Wigmore, *supra*, § 578, at 822–23 ("As a matter of policy, this survival of a part of the now discarded interest qualification is deplorable in every respect; for it is based on a fallacious and exploded principle, it leads to as much or more false decision than it prevents, and it encumbers the profession with a profuse mass of barren quibbles over the interpretation of mere words."). Virginia's statutory revisors were aware of the general disapproval of dead man's statutes when they drafted the 1919 statute, as indicated by the revisors' note's citation to Wigmore's treatise at § 578. Code § 6209 (1919) revisors' note.

These critiques led many influential organizations, including the American Law Institute and the American Bar Association, to recommend abolishing dead man's statutes or enacting revisions making the rule fairer. *See* Edmund M. Morgan, Basic Problems of Evidence 85 (1954). The ABA proposed a new statutory scheme under which if a survivor chose to testify,

his or her testimony would be counterbalanced by admission of the decedent's or incapacitated

person's hearsay declarations, provided that those declarations were honest reflections of that

person's own knowledge. *See* McCormick, *supra*, § 65, at 436 n.15. The ABA intended this

rule to replace those, such as the one in Virginia's first sentence, requiring corroboration and

rendering a survivor's bare testimony legally insufficient to support a judgment. *Id.*

Rather than adopting any one proposal entirely, the General Assembly in 1919 and

through subsequent amendments fashioned a statute combining the incremental improvements

made prior to 1919 in Virginia with other suggestions borrowed from the various proposals,

including the hearsay exception. The resulting statute, as Professor Sinclair observes,

> is much less balanced than the ABA proposal of 1938: it allows
> use of any and all hearsay, regardless of circumstances or whether
> the declarant had personal knowledge of the topics opined upon,
> and it applies whether or not the survivor offers live testimony
> about the disputed events or transactions. . . . [T]he hearsay
> exemption is available to the decedent/disabled person's side,
> *whether or not the surviving witness testifies*. No other state in the
> United States permits the unrestricted freedom [to] offer hearsay
> currently found in the Virginia deadman's statute.

Sinclair, *supra*, § 10-7[d], at 605.

In sum, Virginia's Dead Man's Statute contains two distinct, but related, evidentiary rules

applicable in actions by or against persons incapable of testifying or their representatives. First,

no judgment may be rendered for a testifying survivor unless his or her testimony is

corroborated. This corroboration requirement is inapplicable when another interested party

whose interest derives from the decedent or incapacitated person testifies on that person's behalf.

And second, any relevant hearsay declaration of the decedent or incapacitated person is

admissible even if the survivor does not testify. With these principles in mind, we now turn to

Shumate's arguments.

12

3. Applicability of Statute and Admissibility of Thompson's Statements

Shumate's first argument regarding admission of Thompson's hearsay statements is that the Dead Man's Statute does not apply because Bowman testified as an interested eyewitness to the accident on behalf of the estate. She relies on *Paul v. Gomez*, 118 F. Supp. 2d 694 (W.D. Va. 2000), for the proposition that the Dead Man's Statute is inapplicable when a live eyewitness testifies for the decedent or incapacitated person.

*Paul* was a medical malpractice case in which the plaintiff estate sought to exclude the defendant doctor's testimony related to his conversations with the decedent and the decedent's wife. *Id.* at 695. The estate argued that the statute barred the doctor's uncorroborated testimony because it concerned a transaction with a deceased individual, notwithstanding that the decedent's wife was a live, interested witness who intended to testify for the plaintiff. *Id.* After reviewing the historical development of Virginia's statute, the district court relied upon *Epes* to hold that the 1904 statutory exception permitting uncorroborated survivor testimony in cases where an interested party whose interest derives from the decedent testifies was still in effect and controlled the case. *Id.* at 696 (citing *Epes*, 135 Va. at 87–89). It therefore ruled that the corroboration requirement in the statute's first sentence could not exclude the defendant doctor's testimony, which was competent to counter the decedent's wife's testimony because she was an interested witness present for the conversations. *Id.* In *Johnson*, this Court approved the district court's analysis. 264 Va. at 34–39 (holding that *Paul* "accurately states Virginia law").

Although *Paul* properly applies the exception to the corroboration requirement, that exception is inapplicable to the case at bar. As an initial matter, Bowman is not an interested party. He lacks a pecuniary interest in the outcome of the litigation because he does not represent or otherwise have a stake in the estate—regardless of the result, Bowman will remain

13

financially indifferent. Despite Shumate's protestations on brief that "[w]hether the decedent's live eye witness has a 'pecuniary interest' in the case is not relevant to whether the Rule applies or to the purpose of the Dead Man's Rule," every case interpreting the exception has relied on the interested-noninterested distinction. *See, e.g.*, *Johnson*, 264 Va. at 35 (holding corroboration requirement applicable to certain testimony but inapplicable to other testimony based on whether the witness was interested). Even if Bowman were somehow deemed to be "interested" for these purposes, application of the rule to this case would mean only that Shumate's testimony would not need corroboration—it has no bearing on the admissibility of Thompson's hearsay statements.

More broadly, Shumate's position misunderstands the statute's purpose, which is "to prevent a litigant from having the benefit of his own testimony when, because of death or incapacity, the personal representative of another litigant has been deprived of the testimony of the decedent or incapacitated person." *Diehl v. Butts*, 255 Va. 482, 488 (1998). The statute's first sentence precludes entry of judgment "in favor of an adverse or interested party founded on his uncorroborated testimony" in cases "against the . . . representative of the person" incapable of testifying. Code § 8.01-397. The first sentence's concern with corroboration is irrelevant to whether the decedent's hearsay statements are admissible, which is addressed in the statute's second sentence.

As the second sentence makes apparent, regardless of whether the survivor testifies, any and all relevant "entries, memoranda, and declarations" made by the decedent or incapacitated person while he or she was capable of testifying are admissible. As such, Shumate's collection of misgivings on brief—that unless we adopt her interpretation of the statute, "the party asserting the Dead Man's Rule could bring in a plethora of out of court, unreliable hearsay of what the

14

decedent said to others to bolster unfairly the decedent's case"—is actually an accurate statement of the statute.

We recently considered the statute's second sentence in *Gelber v. Glock*, 293 Va. 497, 509–12 (2017), where we held that the circuit court erred in excluding hearsay statements made by a decedent because they were not contemporaneous with the disputed transaction. We noted that since the 1919 version of the statute created the general hearsay exception, relevance is the only statutory limit on what declarations are admissible. *Id.* Regardless whether the rule is just or even justified, "we have long concluded that it is the role of the General Assembly, not the courts, to change a rule of law that has been relied upon by the bench and bar for many years." *Van Dam v. Gay*, 280 Va. 457, 463 (2010). In this case, "many years" is a century.

Shumate alternatively argues that the Dead Man's Statute is inapplicable to cases in which liability is not at issue because it only applies to "proof of elements of 'any cause.'" She relies on the phrase "from any cause" in the statute's first sentence and *Armada, Inc. v. Lucas*, 2 Va. App. 414 (1986), in which the Court of Appeals held the statute inapplicable to workers' compensation cases. This argument also fails because it relies on an unsupportable reading of the statute.

The phrase "from any cause" does not refer to the scope of issues before the tribunal, but rather to the cause of a party's incapacity to testify. The third sentence of the statute eliminates any confusion on this point: "The phrase 'from any cause' as used in this section shall not include situations in which the party who is incapable of testifying has rendered himself unable to testify by an intentional self-inflicted injury." Code § 8.01-397. Similarly, *Armada*'s ruling relies on the Workers' Compensation Commission's exemption from statutory or common-law

15

rules of evidence, not the fact that workers' compensation benefits are awarded on a no-fault

basis. *Id.* at 417.

Shumate's final evidentiary argument is that even if the Dead Man's Statute applies,

Billy's testimony was not corroborated by testimony from Thompson's other son as required by

a pretrial ruling. This argument is likewise unpersuasive because the circuit court's denial of her

motion in limine imposed no such requirement. It simply stated: "The plaintiff's motion under

the Dead Man's Act to exclude from evidence any relevant testimony of statements made by the

decedent William Earl Thompson is overruled, over plaintiff's objections." For the reasons

discussed above, the statute did not require corroboration of Billy's testimony recounting

Thompson's hearsay statements, which were expressly admissible under the statute's second

sentence.

Accordingly, the Dead Man's Statute applies and Thompson's hearsay statements were

admissible. The circuit court did not err in admitting the hearsay testimony.

B. Damages Verdict

In her second assignment of error, Shumate contends that the circuit court erred in

refusing to set aside the jury's verdict of no damages as contrary to the law and evidence

presented. "When a jury has returned a zero[-]dollar verdict, the issue is whether plaintiff

'produced sufficient evidence to *require* the jury to award her damages.'" *Gilliam*, 293 Va. at 24

(2017) (quoting *Mastin v. Theirjung*, 238 Va. 434, 437 (1989)). "We will not set aside a trial

court's judgment sustaining a jury verdict unless it is 'plainly wrong or without evidence to

support it.'" *Fruiterman v. Granata*, 276 Va. 629, 637 (2008) (quoting Code § 8.01-680).

> If there is conflict of testimony on a material point, or if reasonably
> fairminded men may differ as to the conclusions of fact to be
> drawn from the evidence, or if the conclusion is dependent upon
> the weight to be given the testimony, in all such cases the verdict

> of the jury is final and conclusive and cannot be disturbed either by
> the trial court or by this [C]ourt.

*Gilliam*, 293 Va. at 24 (quoting *Hall v. Hall*, 240 Va. 360, 363 (1990)). As in *Gilliam*, the evidence regarding the nature and extent of Shumate's injuries, and their connection to the collision, was both conflicting and highly dependent on the credibility and weight accorded by the jury to witness testimony. *Id.*

Shumate had the burden of proving her damages by a preponderance of the evidence. *Id.* at 26. The estate's admission of liability did nothing to relieve her of that burden because damages are not presumed in a negligence action. *Id.* at 26 n.7 ("An admission of liability is only an admission of negligence and causation. Therefore, in the context of an automobile accident case, an admission of liability relieves the plaintiff of the burden of proving that the defendant was negligent and that defendant's negligence was a proximate cause of the accident. An admission of liability, however, does not admit compensable damage. Even a finding of liability does not require a finding of some compensable damage.").

The jury had before it evidence demonstrating that, contrary to Shumate's account and her report to her physicians, the collision at issue was minor. Multiple witnesses testified that it occurred as the vehicles edged forward at a stoplight. Photographs from the scene and witness testimony established that both vehicles had minimal damage. Bowman testified that he did not see a dent on the rear of Shumate's car. The record is devoid of evidence regarding repair expenses.

The medical evidence showed that Shumate had a lengthy history of back and neck pain resulting from prior automobile accidents and degenerative changes to her spine, the symptoms of which were unchanged after the 2011 collision. At a pain clinic appointment just nine days after the collision, Shumate apparently did not even mention it. Although one surgeon testified

17

that Shumate's March 2017 surgery was attributable to the 2011 collision, he based that conclusion solely on Shumate's self-report that the 2011 collision caused her pain symptoms and that "[s]he was doing very well prior to" it.  Moreover, Leivy affirmatively testified that Shumate suffered no injury in the accident.  "The jury, as the sole judge of [Shumate's] credibility, was entitled to reject her testimony and conclude that she was feigning or exaggerating her injuries." *Gilliam*, 293 Va. at 25.  The jury was similarly the sole judge of the weight to be given to the medical evidence and physician reports.  *Id.*

Shumate argues that regardless of how the jury interpreted the evidence, the estate conceded at least some damages through Leivy's acknowledgement that it made sense for Shumate to go to the emergency room.  This contention misconstrues Leivy's testimony.  This statement did not contradict Leivy's opinion that Shumate suffered no injury from the collision; instead, it simply acknowledged that it was not irrational for someone with Shumate's medical history to visit the emergency room after any automobile accident to make sure she was not injured.

Shumate also argues that the jury instruction enumerating factors the jury "shall consider" in determining damages if it entered a verdict for the plaintiff required the jury to conclude that she suffered some damages because several of the listed conditions occurred in this case.  This contention is also unpersuasive.  Nothing in the instruction required the jury to find that Shumate suffered damages.  As the other instructions given make apparent, the only issue in the case was "the amount of damages, *if any*, the plaintiff is entitled to recover."  (Emphasis added.)  Adopting Shumate's reading of the instruction—which was Civil Model Jury Instruction 9.000, "General Personal Injury and Property Damage," lightly edited to fit the specific facts of this case—as mandating that the jury find at least some damages would put it in conflict with this

18

Court's precedent approving plaintiff liability verdicts with zero damages.  *See, e.g.*, *Gilliam*, 293 Va. at 27; *Vilseck v. Campbell*, 242 Va. 10, 15 (1991); *Mastin*, 238 Va. at 438–39.

Based on the evidence before it, the jury was entitled to find that Shumate failed to prove by a preponderance of the evidence that she suffered any damages from the collision. Accordingly, because the circuit court's ruling sustaining the jury's verdict was not plainly wrong and was supported by the evidence, we affirm.

### III.  CONCLUSION

Virginia's Dead Man's Statute applies to this case, and under its broad suspension of ordinary hearsay principles, the circuit court did not err in admitting Billy's testimony recounting Thompson's description of the collision.  The jury appropriately exercised its fact-finding function by weighing the evidence and credibility of the witnesses to conclude that although Thompson was liable, Shumate suffered no compensable damages.  Accordingly, we will affirm the judgment of the circuit court.

*Affirmed.*