Present:    All the Justices

CITY OF VIRGINIA BEACH

OPINION BY JUSTICE LEROY R. HASSELL, SR.

v.  Record No. 011613          April 19, 2002

SUSAN OAKES, ADMINISTRATRIX OF THE
ESTATE OF PAULINE BELCHER, ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Edward W. Hanson, Jr., Judge

In this appeal of a judgment entered in favor of landowners in a condemnation proceeding, we consider whether the landowners' evidence of damage to the residue was speculative.

I.

The City of Virginia Beach (the City) filed its petition in condemnation against Susan Oakes, guardian ad litem for Pauline M. Belcher.  During the proceedings, the original landowner died, and Susan Oakes, administrator of the estate of Pauline Belcher, and Belcher's successors in interest were made parties to the proceeding.  These parties will be referred to as the landowners.

The City initiated the condemnation proceeding to acquire real property and easements for the purpose of constructing road and utility improvements to Oceana Boulevard.  The City and the landowners agreed that the value of the land taken was $60,000, which included the fee simple value of the land used

for a drainage easement even though the City only acquired an easement on that land.

II.

Apparently, the circuit court sustained the City's motion to proceed without commissioners because of the landowners' failure to designate commissioners. The following evidence was adduced at a bench trial.

Belcher owned approximately 24 acres of land, and with the exception of a house, the land was unimproved. The land enjoyed a B-2 business zoning classification on about two acres of the property adjacent to Oceana Boulevard. The remaining 22 acres of the property had an "R-5D Residential" zoning classification.

The City acquired about 195 feet of frontage property adjacent to Oceana Boulevard as part of the taking, leaving the landowners with 148 feet of frontage property. The City also acquired the permanent drainage easement noted above which is located on the front of the landowners' parcel. The City used this drainage easement to create a detention pond. The detention pond is unusual because it collects "storm water runoff" accumulated from 3,400 linear feet of ditches along Oceana Boulevard, which is a four-lane highway.

James C. Cahoon, III, a senior environmental scientist who qualified as an expert witness, testified that typical

2

"storm water runoff" from a roadway contains pollutants such as lead, mercury, oil, and grease. The detention pond is designed to filter these pollutants and clean the water, thereby preventing pollutants from entering or leaving the City's storm water system and affecting the state waters. The City is responsible for the maintenance of the detention pond.

Thomas L. Stokes, Jr., an environmental scientist and consultant who testified on behalf of the landowners, stated that a landowner must be aware of any contamination on his property, including contamination in a detention pond. Stokes also testified that in the future, the property might become contaminated from conventional "highway runoff" and that the detention pond is "designed to collect and retain pollutants into it and to cause infiltration to the maximum extent possible into the landowners' land." Stokes stated that 206 accidental spills of pollutants have been reported in the vicinity of the landowners' property since 1992. He testified that a landowner "would want to monitor" a detention pond and detect pollutants that could affect the land. The cost of monitoring the detention pond in this case would be approximately $4,000 annually. Stokes stated, however, that a landowner does not have an affirmative obligation to monitor a detention pond.

Gerald A. Porterfield, a land planner and landscaper, qualified as an expert witness and testified on behalf of the landowners. He testified that the use of the landowners' property is restricted by a perpetual easement over the property for military and naval purposes for use in connection with the Oceana Naval Air Station in Virginia Beach. This easement affects the air rights above the property and limits the activities that can be performed upon the property.

Porterfield testified that only light industrial uses such as "warehousing, wholesaling, [and] distribution . . . uses" may be conducted on the property. He stated that before the City's taking, the best use of the property was the construction of an office warehouse on the front acreage and the construction and operation of "a self-storage, mini-storage" facility on the "bulk of the [rear] property." When asked to describe "in more detail the development [he] envision[ed] would be suitable for that property," Porterfield responded: "Well, it is pretty straightforward. Create a couple of buildings, create a bay of parking parallel to Oceana Boulevard with the necessary landscaping in there, of course, and create some shell buildings that literally front on Oceana Boulevard, with like overhead door access to the rear. And you can do a couple of buildings like that back to

4

a certain point, and then you change it either to multi-storage or self-storage."

Even though Porterfield conceded that the development he envisioned would require a change in the property's zoning classification, he opined that the City "would look highly favorably upon" rezoning the property to accommodate its best use. Porterfield also testified that as a result of the taking, the office space that he had envisioned would have to be 14,000 square feet smaller than an office warehouse that could have been constructed before the taking. He attributed the smaller office space to the location and size of the detention pond. The landowners also presented other expert witnesses who testified that the highest and best use of the residue would be the construction of an office building and "warehouse-type" space.

Dennis W. Gruelle, a real estate appraiser, qualified as an expert witness who testified on behalf of the landowners. He also opined that before the taking, the best use of the property was for light industrial use, "more specifically sort of a small office warehouse facility in the front of the property and mini-warehouse in the rear of the property." He stated that the taking damaged the residue because prior to the taking the property "had about 343 feet of frontage along Oceana Boulevard. The acquisition and the location of the

[detention] pond took approximately 59 percent of that frontage, almost 195 feet, and took out an area in the front, the portion of the property that has exposure along Oceana Boulevard." He also opined that the detention pond had a negative impact upon the value of the residue.

Gruelle stated:

"The total impact in my estimate is $120,000. And it is broken down basically a couple of different ways. As I discussed, the impact with brokers in the market, and many of them had very negative perceptions of this property . . . when there was . . . a drainage pond. But it is a new concept to the extent that there aren't many examples in the market that you can [c]ite.
    "In fact, many brokers were unaware of an incident where a pond was put on a property in easement form. So to try to direct a [comparison] to directly illustrate that impact, it was difficult to do. But the brokers in most cases just would talk about percentage of damages being anywhere from 10 to 15 percent, some of them much higher, some of them wouldn't even – said they couldn't sell the property. But that 10 to 15 percent impact did seem to be a fairly consistent number against the remaining property."

Gruelle testified that his damage estimate of $120,000 was based upon $65,000, which included contingencies and "monitoring costs" associated with the detention pond and $55,000 in lost rents. Gruelle included lost rents in his damage estimate because the size of the office building that Porterfield envisioned could have been constructed before the taking would have to be reduced about 64 percent in building size, resulting in a difference of about $55,000 in potential

6

lost rents.  Gruelle stated that his damage estimate of $120,000 to the residue was supported by "the test of market impact and the test of market perception based on [his] discussions with the brokers and developers and people that [he] discussed this with, again, looking at that percentage. These were the component parts that could relate to that percentage indicating the overall damage impact of [$]120,000."

The City argued in the circuit court that the landowners' evidence of damages was speculative.  The circuit court disagreed with the City and in a written letter opinion, which was made a part of the court's final order, the court accepted Gruelle's conclusion that the damage to the residue was $120,000.  The City appeals.

### III.

The City argues that the circuit court erred "by admitting evidence of, and finding damage based on . . . development plans, and expert opinions based on those plans, even though the plans did not take all current circumstances into consideration and depended upon future approvals, which were out of the landowners' control." Continuing, the City contends that the landowners' damages were speculative because they were based in part upon future rents of a "hypothetical building."  Also, the City asserts

that certain damages that the circuit court included in its award were remote and speculative.  Included in the damage award were a $25,000 reserve account for future prospective environmental damage caused by the detention pond and $40,000 for monitoring for early detection of such prospective environmental damage.

Responding, the landowners contend that the evidence of damages was not speculative and that they presented evidence of the highest and best use of the residue affected by the taking.  The landowners also argue that the circuit court properly considered the negative impact of the detention pond upon the property and that the evidence of damages caused by this negative impact was not speculative.  We disagree with the landowners.

The principles that we apply in our resolution of this appeal are well established.

> "In every eminent domain case involving a partial taking, the measure of damages to the residue of the property not taken is the difference in the fair market value of the residue immediately before and immediately after the taking.  In ascertaining such damages, both present and future circumstances which actually affect the value of the property at the time of taking may be considered, but remote and speculative damages may not be allowed. Colonial Pipeline v. Lohman, 207 Va. 775, 781, 152 S.E.2d 34, 39 (1967); Ryan v. Davis, 201 Va. 79, 82, 109 S.E.2d 409, 412 (1959); Appalachian Elec. Etc., Co. v. Gorman, 191 Va. 344, 353, 61 S.E.2d 33, 37 (1950)."

East Tennessee Natural Gas Co. v. Riner, 239 Va. 94, 100, 387 S.E.2d 476, 479 (1990); accord Wammco, Inc. v. Commonwealth Transp. Comm'r, 251 Va. 132, 137, 465 S.E.2d 584, 586 (1996); Chappell v. Virginia Electric and Power Co., 250 Va. 169, 172, 458 S.E.2d 282, 284 (1995); Town of Rocky Mount v. Hudson, 244 Va. 271, 273, 421 S.E.2d 407, 408 (1992); State Hwy. & Transp. Comm'r v. Lanier Farm, Inc., 233 Va. 506, 510-11, 357 S.E.2d 531, 533-34 (1987).

We have repeatedly emphasized that a landowner whose property is affected by a partial taking may not recover damages to the residue if such damages are remote or speculative. Id.; accord Revocor Corp. v. Commonwealth Transp. Comm'r, 259 Va. 389, 394, 526 S.E.2d 4, 7-8 (2000); Lynch v. Commonwealth Transp. Comm'r, 247 Va. 388, 391, 442 S.E.2d 388, 389-90 (1994). For example, we held in Tidewater Railway Co. v. Cowan, 106 Va. 817, 822, 56 S.E. 819, 820 (1907), that damages to the residue resulting from a partial taking are those that flow directly from the taking and not damages that are merely speculative.

Applying these principles, we hold that the landowners' evidence of damages to the residue was speculative and remote. The office building that Porterfield "envisioned" could have been constructed upon the land before the taking was the product of pure speculation, as were the lost profits caused

9

by a decrease in the rents because of a reduction in the size of this hypothetical building.[*] This hypothetical building could not have been constructed unless and until the City approved zoning changes to the property. Additionally, prior to construction of this hypothetical building, the City would have been required to approve a sewage treatment system and a site plan.

We recognize that the landowners' appraiser, Gruelle, testified that the residue was damaged by 11 percent of the value of the property, which also totals $120,000, the amount of the circuit court's award. However, this opinion was speculative because it was, in part, based upon the existence of the hypothetical building and rents that would accrue from that building.

We also hold that the circuit court should not have considered, in its award of damages to the residue, evidence that pollution spills might occur and contaminate the residue due to a potential failure of the detention pond. Jeffrey Hammaker, who testified on behalf of the landowners, conceded that contamination of the residue would only be caused by acts of negligence or criminal activity. Not only was this evidence of possible contamination speculative, but we have

---

[*] We also observe that the City paid the landowners the full value for the land where the hypothetical office building

10

consistently held that the "eminent domain provisions in the Virginia Constitution have no application to tortious or unlawful conduct, whether by contractors engaged in constructing public improvements, Ryan v. Davis, 201 Va. 79, 83, 109 S.E.2d 409, 413 (1959), governmental agents, Eriksen v. Anderson, 195 Va. 655, 657-59, 79 S.E.2d 597, 598-600 (1954), or third parties who are strangers to the condemnation proceedings, Highway Commissioner v. Crockett, 203 Va. 796, 801, 127 S.E.2d 354, 358 (1962)." Lanier Farm, 233 Va. at 511, 357 S.E.2d at 534.

We agree with the landowners that they are entitled to recover appropriate damages "flowing directly from the taking," id., and that the circuit court must consider the highest and best use of the property. However, these principles do not relieve the landowners of their burden to prove damage to the residue with evidence that is neither speculative nor remote.

Contrary to the landowners' assertion, our decision in Revocor does not support their contention that they presented appropriate evidence of damage to the residue. In Revocor, we considered whether a circuit court properly excluded evidence of adjustment costs as a factor to be considered by the commissioners in determining damage to the residue of the

would have been located.

11

property.  The landowner in Revocor presented testimony that as a result of the taking, the costs of developing a residential parcel had increased because of the necessity to construct a road through a marshy portion of the property with undesirable topography.  259 Va. at 391-92, 526 S.E.2d at 6-7. We pointed out that in determining the diminution of the market value of the residue or damages thereto, a court should consider the expense made necessary by reason of the improvement in adjusting the property to the changed conditions caused by the taking.  Id. at 394, 526 S.E.2d at 8. Unlike the landowner in Revocor, the landowners in this case do not seek damages for increased development costs.  Rather, the landowners in this case seek to recover speculative rents for a building that one of their expert witnesses had "envisioned" might have been constructed on the residue even though the expert witness concedes that the building could not be constructed without a change in the property's zoning classification and certain approvals from the City.

We recognize, as the landowners in this case properly observe, that in Pruner v. State Highway Commissioner, 173 Va. 307, 310, 4 S.E.2d 393, 394 (1939), we held that in a condemnation proceeding, the trier of fact "charged with determining the value of land which is being taken by eminent domain [must] consider all uses to which it may be reasonably

12

adapted and to award compensation upon the basis of its most advantageous and valuable use, having regard to the existing business demands of the community or such as may be reasonably expected in the immediate future."  However, the landowners neglect to mention that we also stated in Pruner that "[p]urely imaginative or speculative value should not be considered."  Id. at 311, 4 S.E.2d at 394.  In this case, the landowners' purported damages to the residue, consisting of lost rents from an "envisioned" building, possible future contamination of a detention pond due to negligent or criminal acts, and the cost of monitoring such pond, are speculative and cannot be recovered.

In view of our holdings, we need not consider the litigants' remaining contentions.  Accordingly, we will reverse the judgment of the circuit court, and we remand the case for further proceedings consistent with this opinion.

Reversed and remanded.

13