PRESENT: All the Justices

HELMICK FAMILY FARM, LLC

                                         OPINION BY

v. Record No. 180691                 JUSTICE STEPHEN R. McCULLOUGH
                                          August 29, 2019

COMMISSIONER OF HIGHWAYS

FROM THE CIRCUIT COURT OF CULPEPER COUNTY
Susan L. Whitlock, Judge

Condemnation commissioners awarded $22,592 in compensation to the Helmick Family Farm, LLC ("Helmick") for a taking of slightly more than two acres of land, along with some easements. Helmick appeals, contending that it was erroneously prevented from presenting evidence of the reasonable probability of a rezoning and, moreover, that the jury received incorrect instructions. Helmick also argues that the testimony of its representative was improperly restricted. Exclusion of this evidence, Helmick contends, prevented the commissioners from considering probative evidence concerning the land's fair market value. For the reasons noted below, we reverse the decision of the trial court.

BACKGROUND

Prior to the take, Helmick Family Farm consisted of approximately 168 acres. It is located in Culpeper County. The land is zoned A1 or Agricultural. The land is essentially vacant. As of the date of the take, it was being used for cattle grazing, and for growing hay. There are some businesses nearby, such as auto repair facilities and a mulch processing plant, as well as more vacant land. The farm has some road frontage, about 2,000 linear feet on Poor Farm Road, as well as a "pipestem" that leads to Greens Corner Road.

In order to build a diamond interchange at the intersection of Route 29 and Greens Corner Road, the Commissioner of Highways ("Commissioner") filed a Certificate of Take on

August 20, 2014, for a portion of the farm. The Commissioner took 2.155 acres in fee simple with a .198-acre permanent drainage easement, a .318-acre temporary construction easement, and a .078-acre utility easement. Helmick refused the Commissioner's offer of $20,281, so the Commissioner filed a petition in condemnation in the Circuit Court of Culpeper County.

Helmick planned to introduce testimony from Charles F. Carter, who was previously employed by Culpeper County as the County Planner, a position later renamed Planning Director, to manage the activities of the Office of Planning and Zoning. He currently is the owner of Carter Planning Group, a consulting firm that provides land planning services to public and private clients. In his written report, Carter opined that the parcels taken by the Commissioner had been for many years "planned for commercial/industrial development." He acknowledged the current zoning of the property was Agricultural. No application for rezoning was pending at the time of the take. Carter's report indicated that "the subject property would be rezoned from A-1 (Agricultural) to LI (Light Industry) if application was made by the landowners." He also would have testified that "[b]ased on the intended commercial/industrial use of the subject property and its association with the adjacent LI and CS parcels, the appropriate zoning designation of the . . . parcel is LI (Light Industry)." Carter would have testified that the Board of Supervisors had approved nearly every application for such rezonings between 2006 and 2015.

Helmick obtained an appraisal from Charles T. Dennis. Dennis reviewed the characteristics of the property. He noted its designation as Commercial property in the County's Comprehensive Plan. The property is also within the Urban Services boundary. Dennis' report details his conversations with the County's planning staff, the fact that nearby properties are devoted to commercial services, its proximity to U.S. Routes 15 and 29 and State Route 666, and

2

its proximity to water and sewer services. Dennis concluded that "the highest and best use of the land would be to rezone the 31.5 acres planned for commercial to LI or another commercial zoning district, and hold the remaining 136.9457 acres for investment purposes." He acknowledged that the Helmick property "will need to be rezoned prior to being used for commercial purposes" and that the rezoning process "can be time consuming." Although Dennis used land zoned Light Industrial, Heavy Industrial, or Commercial Service as comparable sales, rather than land zoned Agricultural, he acknowledged in his report that the need to rezone the Helmick land renders it "inferior to the comparable sales that are all zoned industrial or commercial." Therefore, he applied a discount factor to adjust the price of those sales downward. The price of land per acre for comparable sales ranged from $65,000 to $176,906 per acre. Dennis concluded that the Helmick Farm land was worth $130,000 per acre, a value of $280,150, and that the easements and other improvements make the take worth a total of $321,000.

Prior to trial, the Commissioner filed a motion in limine to exclude all evidence concerning "a hypothetical rezoning of the subject property from Agricultural (A-1) to Light Industrial or Commercial before the take on August 20, 2014." The court agreed, reasoning that such evidence is too speculative and remote. The court ruled that "all testimony and evidence regarding hypothetical rezoning of the subject property is excluded from trial." Accordingly, the court held that Carter "is prohibited and excluded from testifying as to various facts about the area surrounding the property or about the reasonable probability of rezoning the subject property at the time of the take." The trial court further held that Dennis could not testify regarding the comparable sales he used in his appraisal. The trial court also excluded Dennis'

3

"opinion of the highest and best use of the property, regarding the comparable sales he used to come up with his value of the take, and the methodology" he employed.

At the trial, Walter Robinson, the appraiser who testified on behalf of the Commissioner, estimated the value of the land to be $22,464. He opined that the highest and best use of the land is for it to continue as farmland. In reaching his opinion, he relied on sales of property zoned for agricultural use. He acknowledged that none of the comparable sales he used to value the property were designated as Commercial on the County's Land Use Map of its Comprehensive Plan and that none of these sales were within the County's Urban Services Area.

The Culpeper Comprehensive Plan is a document that is prepared every three to five years that serves as a general guide for what possible future development might be for a property or for the County. According to its introduction, "[i]t identifies those areas planned for future growth and the anticipated land use associated with such growth." It is not binding. As Robinson put it, the Comprehensive Plan represents "the best available information that the county wants to give about how they want to see parts of the county develop." Robinson acknowledged that the Comprehensive Plan designation for a property can influence its value. The Comprehensive Plan does not cover the entirety of the Helmick farm, but designates a portion of the Helmick farm as "Commercial," including the portion taken by the Commissioner. The County also produced a future land use map, itself part of the Comprehensive Plan, that designates the Helmick property as commercial.

The court permitted Melvin Helmick, the general manager of Helmick Family Farm, to testify. Mr. Helmick testified that the land taken by the Commissioner was worth $6 per square foot, which, when combined with the value of the easements, had a total value of $640,435.51. He, among others, testified that the land taken is near sewer and water utilities. Helmick testified

4

how much he initially paid for the property, and that he donated 20 acres of land to the County for the purpose of building a sewage treatment plant. In exchange, the County agreed to allow him 16 sewer taps. His testimony was extensive, and it covered his experience as a developer of residential property for more than two decades. He addressed the Comprehensive Plan and nearby commercial development. He also testified that the zoning of nearby properties has a bearing on the value of Helmick's land. His estimate of the value of the property was based on the value of commercial properties nearby. He pointed out that some of those commercial properties, which he described as "within a stone's throw" of Helmick's land, sold for $9 per square foot. He noted that medical buildings were built in close proximity to Helmick's property. He explained that "there's a huge amount of commercial development . . . surrounding" the farm.

The court excluded certain documentary evidence offered by Helmick. Specifically, the court sustained the Commissioner's objections to Helmick's proffered exhibits 27 and 44-47. Exhibit 27 was a letter from the County informing Mr. Helmick that the property had been added to the sewer and water district, and exhibits 44-47 were deeds reflecting land sales that Mr. Helmick relied upon in forming an opinion about the value of the land.

The trial court provided the commissioners with two instructions that are at issue in this appeal. Instruction 7, to which Helmick objected, App. 1094, provided:

> In determining the fair market value of the subject land, you shall
> only consider the uses that may be made of the land under its
> existing zoning category of A-1 Agricultural. You may not
> consider a hypothetical rezoning of the subject land from A-1
> Agricultural to a different zoning category before, on, or after the
> date of take on August 20, 2014 or an envisioned future change
> from the existing zoning category of A-1 Agricultural to a different

5

zoning category. A hypothetical rezoning and an envisioned future change in zoning are speculative and remote.

App. 1113, 1167.

Instruction 8 provided

> You have heard evidence about Culpeper County's Zoning Ordinance. The Zoning Ordinance permits certain uses to be made of land, and also contains other requirements concerning how land may be used.
>
> You have also heard evidence about Culpeper County's Future Land Use Map. The Future Land Use Map does not stand-alone and is not itself the future plan. It and many companion documents are part of Culpeper County's Comprehensive Plan.
>
> The Comprehensive Plan is general in nature and is merely a guide for possible future development in the County. The Comprehensive Plan does not restrict or permit any uses of the land by the owner.
>
> You have also heard evidence about Culpeper County's Future Land Use Plan. The Future Land Use Plan is not an assurance of community acceptance or a commitment to future development by the County.

App. 1113-14, 1168.

Helmick objected to this instruction as well. Helmick argued that the instruction cast "the county's comprehensive plan" in "the most negative light possible instead of actually reflecting that the county's comprehensive plan does reflect what the county envisions as happening in the county." The commissioners awarded compensation to Helmick in the amount of $22,592 and this appeal followed.

ANALYSIS

"The measure of compensation for the property taken is the fair market value of the property at the time of the taking." *Lynch v. Commonwealth Transp. Comm'r*, 247 Va. 388, 391 (1994). We have long defined fair market value as "the price which it will bring when it is offered for sale by one who desires, but is not obliged, to sell it, and is bought by one who is under no necessity of having it." *Tuckahoe Woman's Club v. City of Richmond*, 199 Va. 734, 737 (1958).

A. Ample authority supports the admissibility of evidence that the property taken has a reasonable probability of rezoning.

Helmick argues that he should have been permitted to introduce evidence concerning the reasonable probability of a rezoning of the land taken. We agree. While we have not directly addressed whether evidence concerning the reasonable probability of a rezoning is admissible in a condemnation proceeding, our previous decisions foreshadow the answer to this question. We have noted that "[e]verything which affects the market value is to be taken into consideration." *Appalachian Elec. Power Co. v. Gorman*, 191 Va. 344, 354 (1950). Furthermore, "[i]n determining fair market value, consideration is given to the property's adaptability and suitability for any legitimate purpose in light of conditions and circumstances that exist at the time of the take or that reasonably may be expected in the near future." *Lynch*, 247 Va. at 391. In addition, as Helmick notes, licensed appraisers in Virginia are required by regulation to craft their appraisals in conformity "with the Uniform Standards of Professional Appraisal Practice (USPAP)." 18 VAC § 130-20-180(D). The USPAP provide in Standards Rule 1-3 that

> When necessary for credible assignment results in developing a market value opinion, an appraiser must:
>
> (a) identify and analyze the effect on use and value of existing land use regulations, *reasonably probable modifications of such land*

7

*use regulations*, economic supply and demand, the physical adaptability of the real estate, and market area trends[.]

(Emphasis supplied).

Similarly, a leading manual instructs appraisers as follows: "When vacant land is being valued, the appraiser may explore the possibility of a zoning change." Am. Inst. of Real Estate Appraisers, The Appraisal of Real Estate 587 (9th ed. 1987).

An avalanche of authority from other jurisdictions makes clear that such evidence is widely permitted.[1] The leading treatise on eminent domain also concludes such evidence is admissible. 4 Julius L. Sackman, Nichols on Eminent Domain § 13.04 (2019). The reason for allowing the factfinder to hear such evidence is obvious: a willing buyer will pay more for property that presents a fair prospect for more favorable zoning than a property that offers no such prospect. In an arms-length transaction, "the parties can be expected to bargain toward a price that can be viewed as the value of the property with the more valuable zoning classification, discounted by some amount." William B. Knipe, *Valuing the Probability of*

---

[1] Colorado, *Stark v. Poudre School Dist. R-1*, 560 P.2d 77, 79 (Colo. 1977); California, *Metro. Water Dist. v. Campus Crusade for Christ, Inc.*, 161 P.3d 1175, 1181-82 (Cal. 2007); Connecticut, *Transp. Plaza Assocs. v. Powers*, 525 A.2d 68, 75 (Conn. 1987); Delaware, *Bd. of Ed. v. 13 Acres of Land*, 131 A.2d 180, 184 (Del. Sup. Ct. 1957); Hawaii, *State by Attorney Gen. v. Pioneer Mill Co.*, 637 P.2d 1131, 1138 (Haw. 1981); Idaho, *Ada Cnty. Highway Dist. v. Magwire*, 662 P.2d 237, 239 (Idaho 1983); Illinois, *Oak Brook Park Dist. v. Oak Brook Dev. Co.*, 524 N.E.2d 213, 219 (Ill. App. Ct.1988), *appeal denied*, 530 N.E.2d 250 (table) (Ill. 1988); Maryland, *State Roads Comm'n v. Warriner*, 128 A.2d 248, 251-52 (Md. 1957); Missouri, *State ex rel. Missouri Highway & Transp. Comm'n v. Sturmfels Farm Ltd. P'ship*, 795 S.W.2d 581, 585 (Mo. Ct. App. 1990); Nevada, *City of Las Vegas v. Bustos*, 75 P.3d 351, 352 (Nev. 2003); New Jersey, *Borough of Saddle River v. 66 E. Allendale, LLC*, 77 A.3d 1161, 1175 (N.J. 2013); North Carolina, *Barnes v. North Carolina State Highway Comm'n*, 109 S.E.2d 219, 231 (N.C. 1959); Rhode Island, *Palazzi v. State*, 319 A.2d 658, 662 (R.I. 1974); Tennessee, *Shelby Cnty. v. Mid-South Title Co.*, 615 S.W.2d 677, 680 (Tenn. Ct. App. 1980); Washington, *State v. Motor Freight Terminals, Inc.*, 357 P.2d 861, 862 (Wash. 1960).

*Rezoning*, 56 Appraisal J. 217, 220 (1988). In short, the reasonable prospect of a favorable rezoning has an effect on the market value of the property and is, therefore, relevant.

B.       Nothing in our prior cases forecloses the admissibility of such evidence.

The Commissioner acknowledges that evidence of the reasonable possibility of a rezoning is relevant, Appellee Br. at 14, but contends that the testimony here was properly excluded because the evidence offered was remote and speculative. The Commissioner understands Virginia law to reflect the following categorical proposition: "testimony on conditions which are dependent on the acts of third parties is remote, speculative, and therefore inadmissible." Appellee Br. at 16. Even on this generalized statement, the proposition does not withstand scrutiny. The entire enterprise of assessing the market value of land hinges on proof concerning the acts of a hypothetical third party, namely, a person who would purchase the land. The probable acts of a third party depend on the known facts. In some instances, it would be speculative to indulge in predictions about the probable decisions of third parties. In other cases, the known facts may make it possible to make a determination about the likely conduct of third parties.

Moreover, our prior decisions do not support the Commissioner's position. What our cases reflect is an unwillingness to accept transparent manipulations by a landowner to artificially inflate land values based on conjecture and speculation. Here, the landowner seeks to prove the *actual present market value* based on the reasonable probability of a rezoning. Our cases demonstrate the distinction.

In *Revocor Corp. v. Commonwealth Transp. Comm'r*, 259 Va. 389 (2000), we reversed the trial court on the question of damage to the residue. The damage consisted of costs associated with relocating a road shown on a plat for residential development. *Id.* at 392.

9

Revocor proved that it would have been able to relocate a road through the difficult terrain of its residue and, moreover, the ability to relocate the road in that case "was not predicated upon speculative factors such as the acquisition of rights-of-way from others." *Id.* at 396.

Conversely, in *Wammco, Inc. v. Commonwealth Transp. Comm'r*, 251 Va. 132 (1996), cited by the Commissioner, the landowner sought to present evidence of adjustment costs to prove damage to the residue. *Id.* at 137. We noted that "[l]ike any other evidence of damage to the residue, evidence of adjustment costs is inadmissible if it is based on remote or speculative factors." *Id.* The landowner's adjustment costs were based on the cost to develop the property into its highest and best use. *Id.* at 138. On the western portion of the property, development of the residue of the property was contingent upon the purchase of two lots, plus the acquisition of land across an intervening parcel to gain a right of access. *Id.* On the eastern portion of its property, development required construction of a collector or minor arterial street. This collector road would entail offsite improvements. *Id.* From this evidence, we concluded "that development of the property is contingent on future acts beyond Wammco's control which are remote and speculative" as a matter of law. *Id.*

*Commonwealth Transp. Comm'r v. Glass*, 270 Va. 138 (2005), also relied upon by the Commissioner, was a "unity of lands" case. In *Glass*, a taking from three parcels was at stake. One parcel contained a motel, another parcel contained a restaurant and parking for the motel, as well as wooded and unimproved land, and a third parcel consisting entirely of unimproved land. *Id.* 142-43. Glass, who owned a total of just over 125 acres, filed a motion to add eight tax map parcels to the condemnation proceeding. *Id.* None of these eight parcels were part of the actual take parcels. *Id.* at 143. Generally, a landowner "is entitled to recover for the damage to the remainder of the parcel taken, but not for damage to separate independent tracts." *Id.* at 147-48.

10

"An exception to that general rule, the unity of lands doctrine, allows an owner to recover for damage to other tracts of land which are not part of the actual taking when three factors are present: unity of use, physical unity, and unity of ownership." *Id.* at 148. Of these, unity of use is the most significant. *Id.*

In evaluating this claim, we noted that there was no evidence "of an actual joint use Glass was making of any of the additional parcels in conjunction with the motel and restaurant business, the only uses of the actual take parcels." *Id.* at 150. Undaunted by this seemingly insurmountable obstacle to his "unity of lands" claim, Glass posited that "there was an actual common use of the entire 125 acre tract under his 'business plan' at the date of take." *Id.* We concluded that "[t]he record affirmatively demonstrates . . . that Glass' 'business plan' was an illusion." *Id.* at 151. He had no site plan or plat. *Id.* He had not expended any funds for engineering, site development, financing or anything else. *Id.* There was no evidence of any contracts or even a firm offer from any entity to purchase or develop any part of the tract. *Id.* "There was no evidence Glass, personally, had any plans to develop any part of the 125 acre tract for any specifically identifiable purpose." *Id.* In short, his "'business plan' for 'commercial development' [was] too remote and speculative to establish any unity of use between the actual take parcels and the additional parcels at the date of the take." *Id.* at 152.

Finally, in *City of Virginia Beach v. Oakes*, 263 Va. 510 (2002), the landowner claimed damages "based in part upon future rents of a 'hypothetical building.'" *Id*. at 515. Construction of this building required zoning changes and approval of a sewage treatment system and a site plan. *Id.* at 517. We rejected this claim, concluding that

> the landowners' evidence of damages to the residue was
> speculative and remote. The office building that [the landowners]
> "envisioned" could have been constructed upon the land before the
> taking was the product of pure speculation, as were the lost profits

11

caused by a decrease in the rents because of a reduction in the size of this hypothetical building.  This hypothetical building could not have been constructed unless and until the City approved zoning changes to the property.  Additionally, prior to construction of this hypothetical building, the City would have been required to approve a sewage treatment system and a site plan.

*Id.*

Several conclusions emerge from our review of these cases.  The first is that none of these cases dealt directly with the question of a *reasonable probability of a rezoning* and its effect on the value of land.  Second, the cases cited by the Commissioner do not establish as a categorical rule the proposition that any contingencies beyond the landowner's immediate control are, by virtue of that fact, remote and speculative.[2]  Rather, each case dealt with line drawing in the law of eminent domain against the backdrop of a discrete factual context:  in *Wammco*, it was speculative overreach for the landowner to assume multiple acquisitions and improvements from third parties to establish damage to the residue.  In *Glass*, we rejected an attempt to fabricate a unity of use based on a fictional "development plan."  In *Oakes*, this Court was unwilling to accept a theory of damages that relied on an imaginary building built before the taking upon rezoned land with, in addition, an imagined sewage treatment system.  Conversely, in *Revocor*, the landowner's demonstrated *present* ability to relocate the road was admissible.

_____

[2] The Commissioner also argues that County ordinances require the Virginia Department of Transportation ("VDOT") to approve access for rezoning.  Appellee Br. at 16.  By regulation, however, "VDOT will permit reasonably convenient access to a parcel of record."  24 VAC § 30-73-60(B).  Moreover, the Helmick property had approximately 2000 feet of frontage on Poor Farm Road, App. 891, and approximately 50 feet of frontage on Greens Corner Road.  There is little question that the property would continue to maintain its access while a rezoning application is pending.  Furthermore, no evidence suggests VDOT would withhold such approval.  Accordingly, this is a matter or evidentiary weight for the jury, not admissibility for the court.

12

Transparent attempts to inflate the price of land based on hypothetical future improvements and other schemes are one thing. Reflecting the *current* fair market value of land based on the reasonable probability of a rezoning is another matter altogether. Helmick is not asking for the land to be valued as if it were *actually* zoned commercial. Rather, it asks for its market value to reflect the "reasonable probability" of a rezoning - a fact that any willing buyer would factor into a decision to purchase a piece of property.

We conclude, in accord with the overwhelming weight of persuasive authority, the standards that govern real estate assessments, and the leading treatise on eminent domain, that the reasonable possibility of a rezoning should be taken into consideration in compensating landowners.

       C.      Framework for the admissibility of evidence of a reasonable probability of rezoning.

Having concluded that evidence concerning the reasonable probability of rezoning is admissible to establish the fair market value of a property, we address some additional parameters concerning such evidence. First, "the burden of proving a reasonable probability of rezoning rests on the property owner." Nichols on Eminent Domain § 13.04.[3] "[U]nless the evidence relating to the likelihood of rezoning rises to the level of a probability, it is inadmissible." *Stark v. Poudre Sch. Dist. R-1*, 560 P.2d 77, 79 (Colo. 1977). In addition, the reasonable probability of rezoning must be in the near future. *Dep't of Pub. Works & Bldgs. v.*

---

[3] The landowner generally will present such evidence through expert testimony. *See* Va. R. Evid. 2-702; *see also Barnes v. North Carolina State Highway Comm'n*, 109 S.E.2d 219 (N.C. 1959); *Dolezal v Cedar Rapids*, 209 N.W.2d 84 (Iowa 1973); *State ex rel. Price v. Parcel No. 1-1.6401 Acres of Land*, 243 A.2d 709 (Del. 1968); *Borough of Saddle River v. 66 E. Allendale, LLC*, 77 A.3d 1161 (N.J. 2013); *Stark v. Poudre School Dist. R-1*, 560 P.2d 77 (Colo. 1977); *State by Attorney Gen. v. Pioneer Mill Co.*, 637 P.2d 1131 (Haw. 1981); *Heath v. Comm'r of Transp.*, 398 A.2d 1192 (Conn. 1978); *Dept. of Pub. Works & Bldgs. v. Rogers*, 233 N.E.2d 409 (Ill. 1968); *Palazzi v. State*, 319 A.2d 658 (R.I. 1974).

*Ass'n of Franciscan Fathers*, 371 N.E.2d 616, 618 (Ill. 1977). "[T]he mere possibility that at some time in the future a reclassification might occur" is not sufficient to permit the introduction of such evidence. *Maryland State Roads Comm'n v. Warriner*, 128 A.2d 248, 251-52 (Md. 1957).

The trial court must "make the preliminary determination of whether there is sufficient evidence of a reasonable probability of rezoning to permit [the owner to offer testimony regarding] market value based on such a probability." *Lombard Park Dist. v. Chi. Title & Tr. Co.*, 242 N.E.2d 440, 445 (Ill. Ct. App. 1968). "If the court determines that the evidence falls short, as a matter of law, of showing any reasonable probability of rezoning within the reasonably near future, it must then exclude all such evidence and opinions of value based upon a use permitted only by the rezoning." *Id.*

Factors that are relevant to establish a reasonable likelihood of rezoning include:

> the rezoning of nearby property, growth patterns, change of use patterns and character of neighborhood, demand within the area for certain types of land use, sales of related or similar properties at prices reflecting anticipated rezoning, physical characteristics of the subject and of nearby properties and, under proper circumstances, the age of the zoning ordinance.

*State ex rel. Missouri Highway & Transp. Comm'n v. Pedroley*, 873 S.W.2d 949, 953-54 (Mo. Ct. App. 1994) (quotation omitted); *see also* Nichols on Eminent Domain § 13.04 ("Factors relevant to the probability of a zoning change include neighborhood changes, general changes in land use, and the pattern of prior actions by the zoning authority.").

Finally, our holding comes with "an important caveat to remember":

> the property must not be evaluated as though the rezoning were already an accomplished fact. It must be evaluated under the restrictions of the existing zoning and consideration given to the impact upon market value of the likelihood of a change in zoning.

14

*Mississippi State Highway Comm'n v. Wagley*, 231 So.2d 507, 509 (Miss. 1970) (quoting

Nichols on Eminent Domain § 12.322(1) (1962)).

        D.      Helmick presented sufficient concrete facts to warrant submission of the question of reasonable probability of rezoning to a jury.

With these principles in mind, we conclude that Helmick's evidence was sufficiently concrete to create a jury issue concerning the reasonable probability of a future rezoning. Helmick pointed to the Comprehensive Plan which, although not binding, "identifies those areas planned for future growth and the anticipated land use associated with such growth." The land use map designated the property as commercial. Helmick pointed to land nearby being used for light industrial purposes. He proffered evidence that the Board of Supervisors had approved recent rezoning applications to change the zoning of properties from agricultural to commercial. The property benefitted from road frontage and proximity to water and sewer services. This evidence, if believed by the factfinder, would mean that a willing buyer would pay more because of the realistic, indeed probable, prospect of rezoning. *Compare State v. Motor Freight Terminals, Inc.*, 357 P.2d 861, 863 (Wash. 1960) (evidence was sufficient to present a jury question) *with United States v. 27.93 Acres of Land*, 924 F.2d 506, 513-14 (3d Cir. 1991) (upholding trial court decision to exclude evidence of probable rezoning to a commercial use).

Because Helmick presented sufficient evidence concerning the reasonable probability of a rezoning to create a jury issue, it follows that Instruction 7, which instructed the jury not to consider such evidence, should not have been given.[4] In addition, Carter should have been

---

[4] With respect to Instruction 8, which addressed the import of the Comprehensive Plan, we decline to address the precise wording of such an instruction. Although Helmick objected to the instruction as presenting an unbalanced picture of the role of the Comprehensive Plan, he did not offer precise language to insert in the instruction. The trial court will have the opportunity to revisit the issue. The trial court may exercise its discretion and decide on remand that no instruction is appropriate and allow the attorneys to address the matter in argument instead.

15

permitted to testify about the reasonable probability of a rezoning, and the factors that affect the likelihood of rezoning.

We now turn to the question of whether Dennis should have been permitted to testify about the comparable sales he employed, to provide his opinion of the highest and best use of the property, and to testify concerning the appraisal he prepared. "The question of the admissibility of prior sales of comparable property is one left largely to the discretion of the trial courts." *Edwards v. State Highway Comm'r*, 205 Va. 734, 737 (1965). "[A circuit] court by definition abuses its discretion when it makes an error of law. . . . The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *Porter v. Commonwealth*, 276 Va. 203, 260 (2008) (internal quotation marks and citation omitted). We conclude that the trial court erred in preventing Dennis from testifying and from offering the grounds for his opinion. It also follows that Dennis should not have been precluded from testifying that the highest and best use of the property was for commercial development.

The trial court's exclusion of Dennis' testimony rested on an error of law concerning the viability of Dennis' methodology and the admissibility of evidence concerning the reasonable probability of a zoning change. "Compensation should be awarded upon the basis of the most advantageous and valuable use of the land, or, stated differently, its highest and best use, having regard to the existing business demands of the community or such as may reasonably be expected in the near future." *Appalachian Power Co. v. Anderson*, 212 Va. 705, 708 (1972). Our precedent requires the sales of land to be "similar in locality and character to the land in

---

After all, the Comprehensive Plan speaks for itself. If the trial court chooses to grant an instruction on the subject, it will have the opportunity to consider whether to modify the language of the instruction and, if so, what language to employ to modify it.

16

question." *Edwards*, 205 Va. at 738. Under a comparable sales analysis, the appraiser locates sales of similar property, then makes upward or downward adjustments to these sales prices based on differences in the subject property. *See The Appraisal of Real Estate* at 315 (in using sales comparison, the appraiser should "[c]ompare the subject property and comparable sale properties using the elements of comparison and adjust the sale price of each comparable appropriately"). Factors that cause adjustments, upward or downward, include differences in size, shape, topography, frontage, and more.

Of course, zoning is an important consideration in selecting comparable sales. It is not clear, however, why the Commissioner believes that differences in zoning are uniquely incapable of adjustment. "Comparability is a question of fact," and the trier of fact has broad discretion in considering the matter of comparable sales. *United States v. 819.98 Acres of Land in Wasatch & Summit Counties*, 78 F.3d 1468, 1471 (10th Cir. 1996). As a general proposition, the weight to be given evidence of comparable sales is for the finder of fact. The Court of Appeals of Maryland aptly observed:

> It should be borne in mind . . . that real estate parcels have a degree
> of uniqueness which make comparability, one with the other, in a
> strict sense, practically impossible. We think it the better policy,
> where there are any reasonable elements of comparability, to admit
> testimony as to the sales, and leave the weight of the comparison
> for the consideration of the jury, along with such distinguishing
> features as may be brought out on cross-examination or otherwise.

*State Roads Comm'n of State Highway Admin. v. Parker*, 344 A.2d 109, 115 (Md. 1975) (rejecting contention that sales comparisons should have been excluded on the basis of, among other things, differences in zoning). We fail to see why the Commissioner should be permitted to present his theory of the case via an appraiser who used sales of agricultural land that were not near commercial development or placed on the Comprehensive Plan as commercial land, but the

17

landowner should be forbidden from presenting its theory of the case using land sales with different zoning and then applying a discount.

A leading manual for appraisers provides that

> [i]f there are no private restrictions, the property uses allowed by the zoning typically constitute the available choices in most highest and best use determinations. However, the possibility of a change in zoning should also be considered by the appraiser. If the highest and best use of the site or property is not allowed under current zoning, but there is a reasonable probability that a change in zoning could be obtained due to shifting economic and social patterns, these conditions can be considered in determining highest and best use. However, the appraiser must fully disclose all pertinent factors relating to a possible zoning change, including the time and expenses involved and the risk that the change will not be granted.

The Appraisal of Real Estate, *supra*, at 275.

Other courts have rejected the argument made by the Commissioner that an appraisal like the one prepared by Dennis should be excluded. *State v. Benderson*, 366 So. 2d 276, 278 (Ala. 1979) (zoning differentials in comparable sales used by expert went to the weight but not the admissibility of the evidence); *Department of Transp. v. Patten Seed Co.*, 660 S.E.2d 30, 33 (Ga. Ct. App. 2008) (use of discounted valuations based on properties zoned commercial admissible despite current agricultural zoning); *Bergeman v. State Roads Comm'n of Md.*, 146 A.2d 48, 54 (Md. 1958) (upholding testimony of comparable sales despite differences in zoning); *Ford v. Destin Pipeline Co.*, 809 So. 2d 573, 577-78 (Miss. 2000) (rejecting landowner's argument that the condemnor's expert evidence of a comparable sale should have been excluded due to differences in zoning and noting that such differences constitute an appropriate subject for cross-examination); *State by Comm'r of Transp. v. Caoili*, 639 A.2d 275, 273 (N.J. 1994) ("[W]e reject the State's contention that the owners' evidence should have been excluded because it used commercially-zoned properties as comparable sales in arriving at an initial value of the property

18

and then discounted that valuation in accordance with their estimation of the likelihood of such a variance to arrive at the property's fair market value on the date of taking.").

Finally, Helmick argues that its representative, Mr. Melvin Helmick, was incorrectly "precluded from explaining any substantive basis for his opinion that the Helmick property was worth $6 per square foot." Appellant Br. 30. "We have recognized the general rule that an owner of property is competent and qualified to render a lay opinion regarding the value of that property." *Snyder Plaza Props., Inc. v. Adams Outdoor Advert., Inc.*, 259 Va. 635, 644 (2000). Helmick argues that, because landowners can testify about the value of property, they "should also be able to explain the bases for their opinions of the value of their property," including deeds reflecting sales of property and offering into evidence the letter from the County informing Mr. Helmick that the property had been added to the sewer and water district.

This is not a situation in which a landowner was precluded altogether from explaining how he arrived at his estimate for the worth of his land. The trial court allowed Helmick extensive latitude to establish the basis of his opinion. Helmick relayed his experience as a developer of residential property for over two decades, and the fact that he worked as a licensed contractor and licensed real estate broker. He discussed the impact of the Comprehensive Plan as well as the impact of nearby commercial development. The trial court merely denied admission of certain documentary evidence in support of his opinion. Generally, a landowner should be permitted to explain the basis for his opinion of value, subject to cross-examination by the Commissioner to expose flaws or ignorance concerning the property owner's valuation of property. However, Mr. Helmick was not qualified or even offered as an expert appraiser. Given the wide latitude the trial court afforded Mr. Helmick in his testimony, and the fact that he

19

was not testifying as an expert appraiser, we find no abuse of discretion in the trial court's handling of his testimony or its refusal to admit the proffered exhibits into evidence.

CONCLUSION

For the reasons stated, the order appealed from will be reversed, the commissioners' award set aside, and the case remanded for a new trial not in conflict with the views expressed in this opinion.

JUSTICE GOODWYN, joined by JUSTICE McCLANAHAN and JUSTICE POWELL, dissenting in part, and concurring in part.

I agree with the majority opinion that the reasonable probability of rezoning of property taken through condemnation may be relevant to the property's fair market value and that nothing in our prior cases forecloses the admissibility of such evidence. I also agree with the majority's framework for the admissibility of evidence of a reasonable probability of rezoning. However, I disagree with the majority's conclusion that Helmick presented sufficient facts to warrant submission of the question of reasonable probability of rezoning to the jury. Therefore, I respectfully dissent.

As noted in the majority opinion, a circuit court must make a "preliminary determination of whether there is sufficient evidence of a reasonable probability of rezoning," which would be relevant to market value. *Supra* p. 13 (quoting *Lombard Park Dist. v. Chicago Tit. & Tr. Co.*, 242 N.E.2d 440, 445 (Ill. Ct. App. 1968)). If it determines the landowner's evidence falls short as a matter of law, the circuit court may properly "exclude all such evidence and opinions of value based upon a use permitted only by the rezoning." *Supra* pp. 13–14 (quoting *Lombard Park Dist.*, 242 N.E.2d at 445). In this instance, the circuit court determined that Helmick's

20

evidence fell short and excluded it. Applying the prior decisions of this Court and the framework suggested by the majority indicates that the circuit court did not err in doing so.

In an eminent domain proceeding, just compensation is measured by the fair market value of the property at the time of its taking. *Revocor Corp. v. Commonwealth*, 259 Va. 389, 394 (2000). As stated in the majority opinion, fair market value is "the price which one, under no compulsion to sell, is willing to take for property and which another, under no compulsion to buy, is willing to pay." *Appalachian Power Co. v. Anderson*, 212 Va. 705, 713 (1972) (citation and internal quotation marks omitted).

Fair market value is based on the property's "highest and best use." *Id.* at 708. A property's "highest and best use" depends on the "existing business demands of the community or such as may be reasonably expected in the immediate future." *Appalachian Elec. Power Co. v. Gorman*, 191 Va. 344, 354 (1950) (citation and internal quotation marks omitted).

> In determining fair market value, consideration is given to the property's adaptability and suitability for any legitimate purpose in light of conditions and circumstances that *exist at the time of the take or that reasonably may be expected in the near future*.

*Revocor*, 259 Va. at 394 (emphasis added) (citation and internal quotation marks omitted).

In other words, "[t]he uses to be considered *must be so reasonably probable* as to have an effect on the present market value of the land. Purely *imaginative or speculative value should not be considered*." *Gorman*, 191 Va. at 354 (emphases added). Fair market value does not include "the value after future development of the property, or in the vicinity of it." *Anderson*, 212 Va. at 710 (citation and internal quotation marks omitted).

In *Wammco, Inc. v. Commonwealth*, 251 Va. 132, 138–39 (1996), this Court affirmed a circuit court's exclusion of alleged adjustment costs to develop the residue of property after a taking. There, a property owner proffered evidence that the taking meant the owner would have

21

to conduct on and off-site improvements and acquire rights-of-way to build a road on the residue land in order to develop it as industrial. *Id.* at 135–36. This Court held that the evidence of these adjustment costs to develop the residue land were speculative because the off-site improvements and rights-of-way were contingencies beyond the property owner's control. *Id.* at 138–39.

Similarly, in *Virginia Beach v. Oakes*, 263 Va. 510, 519 (2002), this Court reversed a circuit court's admission of evidence of speculative damages to the residue of property taken for eminent domain. There, the property owner submitted expert testimony that the highest and best use of the residue was development of an office building. *Id.* at 513–14. The expert testified that development of an office building would require rezoning, but that the City of Virginia Beach "would look highly favorable upon" the property's rezoning. *Id.* at 514. Once again, this Court reversed, explaining that development of the office building was speculative because the "hypothetical building could not have been constructed unless and until the City approved zoning changes," a sewage system, and a site plan. *Id.* at 517.

In this case, the property taken was zoned Agricultural. Although the landowner asserted that the highest and best use of the property would be commercial, commercial use of the property was prohibited by the property's Agricultural zoning. It is agreed that the Comprehensive Plan is "not binding" and only indicates what "might happen." Dennis—Helmick's expert witness—proffered in his report that the Comprehensive Plan was no guarantee of the Property's rezoning. Additionally, there is no evidence that Helmick submitted any amendment to the Comprehensive Plan to approve any particular commercial or industrial development. In order for property to be rezoned, there must be an application for rezoning and that application must be approved by the County. *See* Code § 15.2-2286; Culpeper Code § 27-377. It is undisputed that the property owner does not have a vested right to receive such a

22

rezoning. The future approval of the rezoning by the County is a contingency outside the control of the landowner.

At the time of the take, there were no plans to request a rezoning or to change the use of the property in the immediate future. The evidence presented at the evidentiary hearing undisputedly proved that prior to the take, the landowner had not applied for the necessary rezoning. Also, no plats, site development plans, or anything else had been contemplated, created, or submitted concerning the commercial use that the property might be put to—whether commercial services, light industrial, or heavy industrial. There was no evidence presented as to how long it would take a rezoning application to be approved or regarding what information needed to be provided to the County or the expenses that would be entailed in pursuing the rezoning application process.

Although Helmick produced evidence that a rezoning application put forth at some indeterminate time in the future would probably be approved by the County, there was no evidence presented to the circuit court to indicate that the change in use could or would occur in the reasonably near future. Additionally, there was no evidence concerning demand in the area for potential commercial property that was not zoned for that purpose at the time it was purchased, and the landowner provided no evidence of any land in the area zoned Agricultural that had been bought at a premium because of the probability of it being rezoned to Commercial. According to our Court's precedents, these undisputed facts made the change in zoning, and its effect on the fair market value of the property at the time of the take, speculative and remote as a matter of law.

As noted by the majority,

First, "the burden of proving a reasonable probability of rezoning rests on the property owner." Nichols on Eminent Domain § 13.04. "[U]nless the evidence

23

relating to the likelihood of rezoning rises to the level of a probability, it is inadmissible." *Stark v. Poudre Sch. Dist. R-1*, 560 P.2d 77, 79 (Colo. 1977). In addition, the reasonable probability of rezoning must be in the near future. *Dep't of Pub. Works & Bldgs. v. Ass'n of Franciscan Fathers*, 371 N.E.2d 616, 618 (Ill. 1977). "[T]he mere possibility that at some time in the future a reclassification might occur" is not sufficient to permit the introduction of such evidence. *Maryland State Roads Comm'n v. Warriner*, 128 A.2d 248, 251-52 (Md. 1957).

*Supra* p. 13 (internal footnote omitted).

Further,

"[i]f the court determines that the evidence falls short, as a matter of law, of showing any reasonable probability of rezoning within the reasonably near future, it must then exclude all such evidence and opinions of value based upon a use permitted only by the rezoning." *Lombard Park Dist.*, 242 N.E.2d at 445.

Factors that are relevant to establish a reasonable likelihood of rezoning include:

> the rezoning of nearby property, growth patterns, change of use patterns and character of neighborhood, demand within the area for certain types of land use, sales of related or similar properties at prices reflecting anticipated rezoning, physical characteristics of the subject and of nearby properties and, under proper circumstances, the age of the zoning ordinance.

*State ex rel. Missouri Highway & Transp. Comm'n v. Pedroley*, 873 S.W.2d 949, 953-54 (Mo. Ct. App. 1994) (quotation omitted); *see also* Nichols on Eminent Domain § 13.04 ("Factors relevant to the probability of a zoning change include neighborhood changes, general changes in land use, and the pattern of prior actions by the zoning authority.").

Finally, the rule we adopt contains "an important caveat to remember":

> the property must not be evaluated as though the rezoning were already an accomplished fact. It must be evaluated under the restrictions of the existing zoning and consideration given to the impact upon market value of the likelihood of a change in zoning.

*Mississippi State Highway Comm'n v. Wagley*, 231 So.2d 507, 509 (Miss. 1970) (quoting Nichols on Eminent Domain § 12.322(1) (1962)).

*Supra* pp. 13–14.

A property owner wishing to prove that there is a relevant reasonable probability of rezoning must prove that such reasonable probability of rezoning will occur in the near future. Helmick failed to do so. Also bolstering the circuit court's evidentiary ruling—that the relevance of the rezoning that had never been requested was speculative and remote and should be excluded—is the fact that Helmick did not provide any evidence concerning the demand for commercial property in the area or, more importantly, any sales of other properties zoned Agricultural at prices reflecting anticipated rezoning. *See supra* pp. 14–15.

As of the date of the take, the Property was zoned Agricultural and had no development site plan, or pending applications for sewage, water services, or rezoning. Like in *Wammco*, a rezoning of the Property would be contingent on third party acts, such as the County's approval of rezoning or commercial development. Further, the effect of the probability of rezoning on the fair market value of the property taken would also depend on the contingencies such as when the rezoning occurred and the expense of pursuing the rezoning, which are also beyond the control of the landowner. In this instance, there was no evidence that the prospective rezoning was anything more than a probability that at some point in the future a reclassification would occur. That probability, untethered to any time period relative to the date of the take, is not sufficient to permit the introduction of such evidence.

Helmick cites *Lynch v. Commonwealth*, 247 Va. 388 (1994), in support of its position. The property at issue in that case was zoned residential, but we held that evidence showing the property's adaptability for "development as an office/industrial park" was admissible. *Id.* at 393. At the time of the taking in *Lynch*, the property owner had filed an application to rezone the property to general industrial. *Id.* at 390. We observed:

> Although the rezoning application had not been approved on the date of the taking, the County staff had endorsed Lynch's application, and the record

25

indicates that *approval of the application was a virtual certainty. Both parties agreed* that the highest and best use of the property was for industrial purposes, not for residential purposes.

*Id.* (emphasis added). The property owner had also filed an amendment to the locality's comprehensive plan to develop the property as an office/industrial park, which the locality approved before the take. *Id.* The present case is distinguishable from *Lynch* because Helmick had no pending rezoning application nor any development plan at the time of the take, and Commissioner did not concede at trial that the highest and best use was industrial or commercial. Unlike Helmick, the landowner in *Lynch* proved the probability of rezoning in the near future.

Because there was no application for rezoning on the date of take, the record indicated that acts of third parties beyond the control of the property owner would be necessary to secure a rezoning, and there was no evidence that the rezoning could be accomplished in the near future or that any property in the area zoned Agricultural had been bought or sold at a premium because of its probability of being rezoned to Commercial, the circuit court properly applied this Court's precedent in determining that the evidence of the probability of rezoning was too remote and speculative to be admissible.

For the foregoing reasons, I would affirm the circuit court on each of the assignments of error and dissent from the majority opinion to the extent it failed to do so.